IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** § § | **Chapter 11** | |
| **Watson Grinding and Manufacturing Co.,** § § § | **Case No. 20-30967** | |
| Debtor. § § | | |
| **In re:** § § | **Chapter 11** | |
| **Watson Valve Services, Inc.,** § § § | **Case No. 20-30968** | |
| Debtor. § | | |

**DECLARATION OF ROBERT L. WHITE IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Robert L. White, Chief Operating Officer and Secretary of Watson Grinding & Manufacturing Co. ("**Watson Grinding**") and Watson Valve Services, Inc. ("**Watson Valve**") (collectively, "**Debtors**"), and declare under penalty of perjury as follows:

### Introduction

1. On February 6, 2020 ("**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code ("**Bankruptcy Code**") with the United States Bankruptcy Court for the Southern District of Texas ("**Court**").

2. The Debtors have filed and will file various motions and pleadings seeking certain "first day" relief (collectively, "**First Day Motions**") to minimize any disruption resulting from the filing of these chapter 11 cases as well as other possible adverse effects on their business operations. I have reviewed and am familiar with the content of each of the First Day Motions.

Based on my knowledge, after reasonable inquiry, I believe approval of the relief sought in the First Day Motions is necessary to enable the Debtors to transition into, and operate efficiently and successfully in, chapter 11 with minimal disruption or loss of productivity and value.  The relief requested in the First Day Motions is a key component to the Debtors' ability to successfully reorganize through these chapter 11 cases and is in the best interest of the Debtors' estates and their various stakeholders.

3. I joined Watson Grinding in 1977 as a shop helper.  I have served in various operational and management roles for the Debtors.  I have served as Watson Valve and Watson Grinding's Chief Operating Officer and Secretary for the last three years. I am a member of both boards, and I have an ownership interest in both Debtors.  I have over forty years of experience in the grinding and machining services industry.

4. Except as otherwise indicated in this Declaration, all facts set forth in this declaration are based upon (a) my personal knowledge of (i) the Debtors' employees, operations, and finances; (ii) information learned from my review of relevant documents; and (iii) information supplied to me by other members of the Debtors' management and third-party advisors; or (b) my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I am authorized to submit this declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

5. To familiarize the Court with the Debtors' businesses and the events leading up to these bankruptcy filings, this declaration is organized as follows:

> **Part I** – Background and Events Leading to Bankruptcy
>
> **Part II** – Chapter 11 Filing and First Day Motions

## Part I: Background and Events Leading to Bankruptcy

### A. Historical Overview

6. Watson Grinding was founded as a small, privately-held specialty grinding shop in 1960 by James Watson in his garage. Over the following years, Watson Grinding grew to include a full-scale machine shop and began offering thermal spray coatings to its customers. As Watson Grinding continued to grow, it shifted its operations specialty to the manufacturing and service of valve and pump components used in the severe service process. Watson Grinding also specializes in turning and milling alloys, hard metals, and large parts. Watson Grinding began thermal spray coatings during the 1980s. Over the years, Watson Grinding has developed and perfected high velocity oxygen fuel and ceramic coatings for applications to help prevent wear and corrosion in the severe service process. Watson Grinding is headquartered in Houston, Texas but has customers around the world.

7. Watson Grinding is owned in the following percentages:

| | |
|---|---|
| John Watson | 63.778% |
| Robert White | 17.096% |
| Judy White | 2.029% |
| Jason White | 17.096% |

8. Watson Grinding's assets primarily consist of receivables, equipment and machinery, raw materials/inventory, vehicles, intellectual property, and insurance proceeds stemming from a tragic explosion at Watson Grinding's thermal coating facility. This list is not intended to be an exhaustive list of Watson Grinding's assets.

9. In contrast to Watson Grinding, Watson Valve is a relatively young company. It was founded in 2002 to meet the growing needs of the severe service valve industry. Watson Valve has grown exponentially since its inception and serves its clients throughout the world. Watson Valve is headquartered in Houston, Texas.

10. Watson Valve specializes in supplying specialty and custom valves for the severe service ball ~~value~~ valve market, with a particular specialty in valves for autoclaves used to mine gold. An autoclave, as depicted below, removes the gold from the ore:



Cutaway image of gold ore processing autoclave (source: Unearthed Challenge-Newcrest Mining)

11. Watson Valve is owned in the following percentages:

| | |
|---|---|
| John Watson | 70% |
| Robert White | 15% |
| Jason White | 15% |

12. Watson Valve's assets primarily consist of receivables, customer contracts, intellectual property, and potentially some insurance proceeds. This list is not intended to be an exhaustive description of Watson Valve's assets.

### B. January 24, 2020 Explosion at Watson Grinding

13.     Watson Grinding and Watson Valve are family owned businesses built on decades of goodwill with customers, suppliers, and employees as well as the leadership of a well-respected management team with a reputation in the community for providing quality products and services.

14.     In the early morning of January 24, 2020, a tragic explosion occurred at the Watson Grinding thermal spray coating facility.  The Bureau of Alcohol, Tobacco, Firearms and Explosion ("**ATF**"), along with other governmental agencies, have and continue to investigate the origin and cause of this disastrous event.  The origin and cause of the event are unknown.  No criminal charges have been brought in connection with this occurrence.

15.     The explosion damaged the Debtors' facilities located at various addresses on Gessner and Steffani Lane in Houston, Texas (77041) and abruptly halted operations.  The photograph below depicts the damage to the Debtors' facilities before and after the explosion:



16.     Unfortunately, due to what is expected to be a long-term interruption of normal business operations for the Debtors, the Debtors were forced to terminate the employment of 83 employees.  The Debtors provided notice of this layoff to the Texas Workforce Commission.  The Debtor currently employs 38 people.

17. The Debtors are conducting limited operations to mitigate disruption to its customers and to preserve value. The Debtors have retained 36 employees for its limited business operations pending reorganization through these chapter 11 cases.

### C. Insurance

18. In the ordinary course of operations, the Debtors' maintain a suite of insurance programs, including workers' compensation insurance, third party liability, property, and other insurance programs (each, an "**Insurance Program**") and incur certain obligations to pay premiums and other obligations related thereto, including, but not limited to, broker or advisor fees, taxes, other fees, and deductibles (collectively, "**Insurance Obligations**"), in accordance with or relating to their respective insurance policies (each, an "**Insurance Policy**") through several insurance carriers (each, an "**Insurance Carrier**").

19. The Debtors' Insurance Programs include: (i) coverage of workers' compensation and employer's liability ("**Workers' Compensation Insurance**"); (ii) coverage of potential third-party liability in connection with the Debtors' business operations ("**General Liability Program**"); (iii) coverage of the Debtors' vehicles ("**Automobile Liability Program**"); and (iv) excess coverage for various casualty Insurance Policies, as described below ("**Excess Liability Program**"). The Debtors also employ, in the ordinary course, the services of the Insurance Broker (as defined below) in connection with maintaining the Debtors' Insurance Programs. The Insurance Programs and the role of the Insurance Broker are discussed below.

20. As of the Petition Date, the Debtors do not believe that they owe any amounts with respect to the pre-petition Insurance Obligations, including amounts owed to the Insurance Broker, and do not expect that any pre-petition Insurance Obligations will come due in the first 21 days of these chapter 11 cases. The Debtors' Insurance Programs are as follows:

**(a)** **Workers' Compensation Insurance**

(i) In the ordinary course of business, the Debtors maintain Workers' Compensation Insurance in Texas for claims arising from, or related to, employment by the Debtors ("**Workers' Compensation Claims**"). It is my understanding that the Workers' Compensation Insurance covers, among other things, statutory workers' compensation and employer liability claims generally arising from accidents, disability, death, or disease sustained by employees in the course of their employment with the Debtors. In each instance, the Debtors' liability for each Workers Compensation Claim is covered in full by an Insurance Carrier and does not require payment of a deductible.

(ii) Specifically, the Debtors maintain Workers' Compensation Insurance through a policy ("**Workers' Compensation Insurance Policy**") with Texas Mutual Insurance Company ("**Texas Mutual**"). The coverage period is November 30, 2019 through November 30, 2020. I have been advised that the Workers' Compensation Insurance Policy provides coverage up to $1 million in the event of a valid claim. To the best of my knowledge, the Debtors do not owe any pre-petition amounts on account of the Workers' Compensation Insurance as of the Petition Date.

(iii) It is my understanding that under the Workers' Compensation Insurance Policy, Texas Mutual is obligated to pay all or part of a Workers' Compensation Claim directly to an employee, his or her medical providers, or his or her heirs or legal representatives. The Debtors will work with Texas Mutual to resolve any valid Workers' Compensation Claims through the bankruptcy process.

(iv) I believe that workers' compensation in Texas also covers employer liability claims. This coverage, commonly known as "Coverage B" in Texas, covers claims against a subscribing employer by the surviving spouse and "heirs of the body" of a deceased employee against claims seeking exemplary damages pursuant to Texas Labor Code Section 408.001(b). Further, any umbrella policies will typically "follow form" and cover excess liabilities under Coverage B as well, not just casualty losses.

**(b)** **General Liability Program**

(i) It is my understanding that the General Liability Program provides coverage for legal or contractual liability, or other damages to third parties arising from, or incurred to third parties in connection with the Debtors' manufacturing programs or the Debtors' premises. In particular, the General Liability Program may cover general commercial liability, including property and personal injury damages to third parties arising out of the Debtors' business operations.

(ii) For Watson Grinding, United Fire Insurance is the primary insurer with

        coverage amounts totaling $1,000,000, issued on November 19, 2019. Its policy number is 85319121.

(iii) For Watson Valve, AXA XL is the primary insurer with coverage amounts totaling $1,000,000, issued in November of 2019. The policy number is US00087635LI19A.

(iv) I understand that the Debtors also have first party insurance that relating to real ($6.3 million) and personal property ($16 million), business interruption income loss ($1.6 million), and temporary wages. Both first party property claims are with United Fire Group. The Watson Grinding first party policy has a policy number of 85319121. The Watson Valve first party policy number is 6041960. There may be additional policies that provide coverage in the event of a loss. The Debtors continue to gather information from its Insurance Broker and insurers regarding these policies. This declaration may be supplemented as additional insurance information becomes available.

(v) To the best of my knowledge, the Debtors do not owe any amounts on account of the General Liability Program as of the Petition Date.

**(c)** **Excess Liability Program**

It is my understanding that Watson Grinding has policy with Navigators Insurance that provides excess liability coverage in the event of a loss up to $5,000,000. I have been told that RSUI has the final layer of excess liability coverage in the amount of $20,000,000. The coverage period for the Excess Liability Program is November 30, 2019 through November 30, 2020. I also understand that Watson Valve has a policy with AXA XL that provides excess liability coverage in the event of a loss up to $10,000,000. I have been told that RSUI has the final layer of excess liability coverage for Watson Valve in the amount of $15,000,000. To the best of my knowledge, the Debtors do not owe any amounts on account of the Excess Liability Program as of the Petition Date.

**(d)** **Insurance Broker Services**

The Debtors retain Al Thurmond Agency, Inc. to serve as their insurance broker for the Insurance Programs (the "Insurance Broker"). The Insurance Broker provides access to specific insurance markets and expertise in certain lines and types of coverage. In addition, the Insurance Broker often acts as the intermediary between the Debtors and the Insurance Carriers, as the Insurance Broker will often transfer insurance premiums and claims asserted for various Insurance Programs to the various Insurance Carriers. The Debtors pay the Insurance Broker commissions up-front as policies are renewed each year, based on the aggregate amount of the Debtors' insurance premiums. To the best of my knowledge, the

Debtors do not owe any pre-petition commissions to the Insurance Broker as of the Petition Date.

**D. Financial Condition**

21. During the 2019 calendar year, Watson Grinding had gross revenue totaling approximately $23 million, and Watson Valve had gross revenue totaling approximately $7 million.

22. The Debtors' have limited secured debt through a line of credit with Texas Capital Bank. As of filing, the Debtors were obligated to Texas Capital Bank for approximately $3 million. The Debtors intend to pay Texas Capital Bank in full, subject to the approval of the Bankruptcy Court.

23. Prior to the explosion, the Debtors' were not experiencing financial difficulty. The Debtors' financial condition has materially changed as a result of the explosion.

24. After the explosion, among other things, the Debtors and Debtors' management (i) were immediately inundated with voluminous litigation in many different courts; (ii) became subject to numerous ex parte temporary restraining orders from private litigants (including one obtained the same day as the explosion); (iii) needed to devote nearly all of their efforts to be responsive and cooperate with the agencies conducting investigations at the Debtors' facilities (which investigations are on-going and active); and (iv) needed to determine a path forward, including whether their businesses could continue to be viable in light of the extensive damage to their facilities, which has impeded their ability to operate in the normal course. The financial impact of the explosion on the Debtors' daily operations as well as the extent of unknown liability necessitated the filing of these chapter 11 cases.

**E. Access to Records**

25. The Debtors use outside accountants to prepare their financial statements and tax returns. The Debtors' financial statements were completed through the 3rd quarter of 2019. Leading up to January 24, 2019, the Debtors' in-house financial team had prepared the trial balance to be provided to the outside accounting firm. On the morning of January 24, the trial balance was sitting on the desk of the Debtors' controller, waiting to be delivered to the outside accounting firm. Since that date, the Debtors have not had access to most of their financial records, which has made preparing the schedules and statement of financial affairs nearly impossible and has significantly impeded many other necessary tasks.

26. The Debtors are committed to cooperating with local, state, and federal authorities during their investigations to preserve the evidence necessary to complete those investigations. The Debtors do, however, need to gain access to financial data in order to comply with the requirements of the Bankruptcy Code and to continue limited operations to preserve value. The Debtors have been in contact with the Department of Justice and the Office of the United States Trustee before and after the Petition Date to discuss these issues and try to find a solution to gain access to necessary records.

27. As additional information becomes available to the Debtors, they may submit a supplemental declaration in support of the First Day Motions.

**F. Litigation / Unknown Claimants**

28. Litigation against the Debtors, including obtaining ex-parte temporary restraining orders, began within hours after the explosion. As of the Petition Date, approximately 25 lawsuits have been filed against one or both of the Debtors (and other parties).

29. The Debtors have in place significant insurance coverage, but without knowing the cause of the explosion, the Debtors simply do not have visibility as to the extent of any liability and/or their losses. The Debtors believe that these chapter 11 cases will allow for the management of litigation in a manner that preserves value for their estates and creditors. Moreover, the Debtors believe that these chapter 11 cases will provide a mechanism to ensure that the public receives appropriate notice designed to provide all potential claimants with due process and an opportunity to submit claims if they believe they have claims against either of the Debtors. Through these chapter 11 cases, the Debtors intend to reorganize, marshal insurance proceeds, and provide for the allowance and payment of claims through an orderly claims process rather than a race to the courthouse.

## Part II: Chapter 11 Filing and First Day Motions

30. As a result of the explosion at Watson Grinding on January 24, 2020, the Debtors filed these chapter 11 cases to preserve assets and allow for an orderly claims process as to each of the Debtors. While Watson Valve may have had nothing to do with the explosion, it has been named in many of the lawsuits brought against Watson Grinding. During the coming weeks and months, the Debtors plan to engage all of their constituencies, including any government agencies, any official committee of unsecured creditors formed in this case, the United States Trustee, and litigation claimants, among others, in a productive dialogue regarding claims resolution and the Debtors' plan to reorganize. The Debtors believe that these chapter 11 cases will provide for the organization and structure necessary to appropriately address the rights of their various stakeholders.

31. Contemporaneously with the filing of this Declaration, the Debtors have filed a number of First Day Motions. I have reviewed and am familiar with the content of each of the

First Day Motions, and I believe that the relief requested in those motions is necessary to allow the Debtors to operate and reduce the disruption the Debtors' businesses have already experienced. I understand that the Debtors intend to seek the entry of Court orders approving each of the First Day Motions as soon as possible in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas. Given the exigencies that exist, I believe emergency relief is appropriate and serves the interests of the estate.

32. The Debtors have filed the following First Day Motions:

**A. Motion to Maintain Cash Management System, Bank Accounts, and Business Forms**

33. By their Motion for Entry of Interim and Final Orders Authorizing the Debtors to Continue Using their Cash Management System, Maintain Existing Bank Accounts, and Business Forms ("**Cash Management Motion**"), the Debtors seek authority to maintain their existing cash management system, bank accounts, and business forms. Watson Grinding continues to pursue the collection of accounts receivable. Some of those collections are paid via ACH or wire transfer to specific bank accounts. With Watson Valve, the entity continues to try and source materials, machining, coating, O2 cleaning and testing. The maintenance of the cash management system is necessary to continue these efforts, as most of these vendors require cash on delivery. Additionally, Watson Grinding and Watson Valve employ a combined 38 employees. Out of these employees, four employees work for Watson Valve and thirty-four work for Watson Grinding. These thirty-four employees are necessary to resume business. These employees need to be paid, and the ability to pay these employees from the existing payroll account.

34. The Debtors' primary operating account is a Texas Capital Bank ending in 0594 for Watson Grinding and 0552 for Watson Valve. There is also a Watson Grinding payroll bank account at Texas Capital Bank. Additionally, there are two separate accounts for specific projects for Watson Valve (the "**Russia Project**" and the "**China Project**"). As of the Petition Date, the Debtor held a separate account at BBVA Compass Bank to segregate insurance proceeds.

35. To minimize expenses and interruption to the business, the Debtors request that they be authorized to use their existing check stock, correspondence, and business forms substantially in the forms existing immediately before the Petition Date.

36. The entry of an order granting the Cash Management Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estate. I have read the factual allegations contained in the Cash Management Motion, and they are true and correct.

### B. Motion for Joint Administration

37. I have read the factual allegations contained in the Debtors' Motion for Joint Administration, and the allegations are true and correct.

### C. Motion to Extend Deadline to File Schedules and Statement of Financial Affairs

38. At this time, the Debtors do not have access to all of their business records, including necessary financial information. Without these records, the Debtors cannot complete their schedules and statement of financial affairs without incurring significant costs. I have read the allegations in the Debtors' Motion to Extend Deadline to File Schedules and Statement of Financial Affairs. The allegations are true and correct.

I respectfully request that the Court grant all relief requested in the First Day Motions, along with any and all other and further relief that the Court may deem to be just and proper. Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of February 2020

Robert L. White
Chief Operating Officer, Secretary
Watson Grinding & Manufacturing Co.
Watson Valve Services, Inc.