

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
06/25/2020

| | | |
|---|---|---|
| In re: | § | |
| **Watson Valve Services, Inc.,** | § | |
| Debtor. | § | |
| | § | **Case No. 20-30968** |
| | § | **Chapter 11** |
| | § | |

**ORDER GRANTING CHAPTER 11 TRUSTEE'S EXPEDITED MOTION**
**FOR AN ORDER AUTHORIZING THE SALE FREE AND CLEAR OF**
**LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES TO**
<u>**MOGAS INDUSTRIES, INC. OF CERTAIN ASSETS**</u>

Upon consideration of the expedited motion filed by Robert Ogle, in his capacity as

duly appointed Chapter 11 Trustee ("<u>Trustee</u>") over the bankruptcy estate ("<u>Estate</u>") of

Watson Valve Services, Inc. (the "<u>Debtor</u>") seeking the entry of an order authorizing the sale

free and clear of liens, claims (including setoff and recoupment), interests, and encumbrances to

MOGAS Industries, Inc. (the "<u>Buyer</u>") of certain assets described in the Agreement (the

"<u>Motion</u>"), pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code[1], Bankruptcy Rules

2002, 6004 and 6006, and the Local Rules; and the Court having jurisdiction to consider the Motion

and the relief requested therein pursuant to 28 U.S.C. § 1334; and a hearing to consider the

Motion and the transaction contemplated therein (the "<u>Hearing</u>") having been conducted on

June 25, 2020; and the Court having considered any objections to the Motion and the arguments

of counsel in support, and in opposition to (if any), the Motion; and due and proper notice of the

Motion and the Hearing having been provided to all parties entitled thereto; and the Court having

determined that the relief sought in the Motion and the Agreement represents the sound exercise

of the Trustee's business judgment and is in the best interests of the Estate and all parties-in-

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them as set forth in the Motion
and the Agreement.

interest; and upon the Motion and all of the proceedings had before the Court; and good and sufficient cause appearing therefore;

IT IS HEREBY FOUND AND DETERMINED:

## General

A.      The Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §1334. The Motion is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue is proper in this Court under 28 U.S.C. §§1408 and 1409.

B.      The statutory predicates for the relief sought in the Motion are sections 105(a), 363(b), (f) and (m) and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.

C.      Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein.

D.      The Trustee has satisfied all applicable disclosure requirements in the Bankruptcy Rules and the Local Rules.

E.      As evidenced by the certificate(s) of service filed with the Court, and based on the representations of counsel at the Hearing, (i) proper, timely, adequate, and sufficient notice of the Motion, the Agreement, and the transactions contemplated therein and the Hearing has been provided in accordance with sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002(a), 6004 and 6006; (ii) such notice was good and sufficient and appropriate under the particular circumstances; and (iii) no other or further notice of the Motion, the transactions contemplated therein or the Hearing is required.

F.      A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities, including, but not limited to (i) the Office of the United States Trustee; (ii) counsel to the proposed Buyer; (iii) counsel to JB Valve; (iv) all known persons holding a lien, claim, encumbrance or other interest in, to or against any of the Acquired Assets; (v) all applicable federal, state and local taxing authorities; (vi) all applicable federal, state and local governmental bodies; (vii) counsel for Texas Capital Bank; (viii) all entities who have filed a notice of appearance and request for service of papers in the Debtor's bankruptcy case pursuant to Bankruptcy Rule 2002; and (ix) all parties in interest to the relief requested in the Motion.

## The Bankruptcy Case

G.      On February 6, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

H.      On June 4, 2020, the Court entered its order approving the appointment of the Trustee as the Chapter 11 Trustee in this Bankruptcy Case.

I.      The Acquired Assets are property of the Debtor's estate and title thereto is vested in the Debtor's estate.

## The Sale of the Acquired Assets to Buyer

J.      The transactions effectuating, and the terms and conditions governing, the sale of the Acquired Assets to the Buyer are embodied in the Agreement, which is in substantially the form attached hereto as Exhibit A. A description of the Acquired Assets is contained in the attached Agreement.

K.     The Agreement contemplates that the sale of the Acquired Assets shall be free and clear of all liens, claims, interests, and other encumbrances within the meaning of section 363(f) of the Bankruptcy Code (collectively, "Liens"); provided, however, that all Liens (in the same priority as exists pre-closing) will attach to the proceeds at Closing (as defined in the Agreement) upon the transfer to Seller when all conditions precedent to Closing have been fulfilled.

L.     The Buyer's obligation to consummate the transactions contemplated in the Agreement is subject to the specific conditions outlined therein, including Court approval.

M.     The Agreement was negotiated, proposed, and entered into by and between the Buyer and the Trustee on behalf of the Estate without collusion, in good faith, and from arm's length bargaining positions. Neither the Trustee nor the Buyer has engaged in any conduct that would cause or permit the application of section 363(n) of the Bankruptcy Code to the sale of the Acquired Assets, including having the Agreement voided.

N.     The Buyer is a good faith purchaser in accordance with section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. Absent a stay of the effectiveness of this Order, if any, the Buyer will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions in accordance with the Agreement. The Buyer shall not be deemed to be a successor in interest to the Debtor, the Trustee, the Estate, the reorganized debtor, or any assignee or successor-in-interest to any of such parties, and the Buyer shall not have any successor liability as to any of the Acquired Assets. Notwithstanding the foregoing, the Court makes no findings with respect to the Buyer's prior attempts to purchase these assets.  This Order does not preclude any determination that the prior attempts to purchase the assets were in violation of the law; nor does it preclude the United States from any action that it may take with respect to any such prior attempts to purchase the assets.

Case 20-30968 Document 134 Filed in TXSB on 06/24/20 Page 296 of 34

O.      The terms and conditions of the Agreement: (i) are fair and reasonable, (ii) valid, binding and enforceable, (iii) constitute the highest and best offers for the Acquired Assets, (iv) will provide a greater recovery for the Estate's creditors than would be provided by any other practical available alternative, and (v) constitute reasonably equivalent value and fair consideration for the Acquired Assets.

P.      The transactions contemplated by the Agreement will, upon consummation thereof (the "Closing"), (i) be legal, valid, and effective transfers of the Acquired Assets to the Buyer with no further action required on the part of the Trustee and (ii) vest the Buyer with good and indefeasible title to the Acquired Assets free and clear of all Liens, claims (including setoff and recoupment), interests and encumbrances within the meaning of section 363(f) of the Bankruptcy Code.

Q.      The Buyer would not have entered into the Agreement and will not consummate the transactions described in the Agreement (thus adversely affecting the Estate and its creditors) if the sale of the Acquired Assets is not free and clear of all Liens, claims (including setoff and recoupment), interests and encumbrances.

R.      The relief sought in the Motion is in the best interest of the Estate, and all parties in interest thereto.

S.      The Trustee has demonstrated (i) good, sufficient, and sound business purpose and justification for the transactions contemplated in the Agreement, including the necessity for selling the Acquired Assets for the Purchase Price as the highest and best offer and without a formal auction process and (ii) compelling circumstances for the sale pursuant to section 363(b) of the Bankruptcy Code.

T.      The Agreement was not entered into for the purpose of hindering, delaying, or defrauding the Estate's creditors, and the parties are not entering into the transactions contemplated

by the Agreement fraudulently; provided, the Court makes no findings with respect to the intent of any parties with respect to a prior attempted purchase of the assets.

U.      Based on the Motion and evidence proffered or adduced at the Hearing, (i) the Buyer has submitted the highest and best possible offers for the Acquired Assets; (ii) the consideration provided for in the Agreement provides fair and reasonable consideration for such Acquired Assets under all the circumstances; (iii) the Trustee, after consulting with his advisors, does not believe that any other party will make an offer for the Acquired Assets for greater economic value to the Estate than the offer of the Buyer currently under consideration in the Agreement; and (iv) the consideration to be paid to the Estate under the Agreement, constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code.

V.      The sale must be approved and consummated promptly in order to maximize the value of the Estate.

W.      Upon entry of this Order, the Trustee has all the corporate or organizational power and authority necessary to consummate the transactions contemplated by the Agreement.

X.      Except as otherwise provided in this Order, no consents or approvals are required for the Trustee to consummate the transactions contemplated by the Agreement.

Y.      The Trustee has demonstrated good, sound and sufficient business purpose and justification, and it is a reasonable exercise of his business judgment, to sell the Acquired Assets on the terms and conditions set forth in the Agreement and consummate all transactions contemplated by the Agreement, and the sale of the Acquired Assets is in the best interests of the Estate and its creditors.

Z.      The Trustee may consummate the transactions and transfer the Acquired Assets free and clear of all Liens, claims (including setoff and recoupment), interests, and encumbrances of any kind or nature whatsoever, because one or more of the standards set forth in section

363(f)(1)-(5) of the Bankruptcy Code has been satisfied. All parties with Liens of any kind or nature whatsoever in or on the Acquired Assets, except as expressly permitted by the Agreement, who did not object to the Motion and the relief requested therein, or who withdrew their objections to the transactions, are deemed to have consented pursuant to sections 363(f)(2) of the Bankruptcy Code. All parties with Liens of any kind or nature whatsoever in the Acquired Assets, who did object to the Motion and the relief requested therein fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Liens attach to the net proceeds of the transactions with the same validity, enforceability, priority, force and effect that they now have as against the Acquired Assets, subject to the rights, claims, defenses, and objections, if any, of all parties in interest with respect to such Liens.

AA. Except as otherwise provided in the Agreement, consummation of the transactions will not subject the Buyer to any debts, liabilities, obligations, commitments, responsibilities or claims of any kind or nature whatsoever, whether known or unknown, contingent or otherwise, existing as of the date hereof or hereafter arising, of or against the Debtor, the Trustee, any affiliate of the Debtor, any affiliate of the Trustee, or any other person by reason of such transfers and assignments, including, without limitation, based on any theory of antitrust, successor or transferee liability or setoff and recoupment.

BB. Assignment Procedures, as in the Motion, are fair and reasonable and supported by the sound business judgment of the Trustee. The Assignment Procedures affords all parties in interest to the Assigned Contracts a reasonable and fair opportunity to assert any and all rights thereto. No other or further notice, opportunity or procedures are required to consummate the transactions contemplated by the Agreement, including, without limitation, the transfer of the Acquired Assets to the Buyer and the assignment of the Assigned Contracts to the Buyer – both of

which shall be free and clear of all Liens, claims (including setoff and recoupment), interests and encumbrances of any kind.

ACCORDINGLY, THE COURT HEREBY ORDERS THAT:

### General Provisions

1.    The findings of fact entered above and the conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any finding of fact shall later be determined to be a conclusion of law, it shall be so deemed, and to the extent that any conclusion of law shall later be determined to be a finding of fact, it shall he so deemed.

2.    Omitted.

3.    All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled.  Those parties who did not object, or who withdrew their objections to the Motion prior to the Hearing, are deemed to have consented to section 363(f)(2) of the Bankruptcy Code.

### Approval of the Agreement and Transfer of Acquired Assets

4.    Omitted.

5.    The sale of the Acquired Assets and the terms and conditions contemplated by the Agreement, including, without limitation, the closing of the transactions contemplated by the Agreement, is hereby approved pursuant to sections 105(a), and 363(b) and (f) of the Bankruptcy Code.

6.    The Assignment Procedures, as detailed in the Motion, are approved and ratified, as applicable. The Trustee is authorized and directed to proceed accordingly with the Assignment Procedures, as detailed in the Motion.

7.     The Trustee is authorized and directed, pursuant to sections 105(a), 363(b) and 365, of the Bankruptcy Code, to perform all of its obligations pursuant to the Agreement and to execute such other documents and take such other actions as are necessary to effectuate the transactions contemplated by the Agreement.

8.     The sale of the Acquired Assets, pursuant to this Order and the Agreement, will vest the Buyer with good and indefeasible title to the Acquired Assets and will be a legal, valid and effective transfer of the Acquired Assets (including, without limitation, the Assigned Contracts) free and clear of all Liens, claims (including setoff and recoupment), interests and encumbrances of any kind.

9.     Pursuant to sections 105(a), 363(f) and 365 of the Bankruptcy Code, upon the Closing, the Acquired Assets (including the Assigned Contracts) shall be sold, assumed, transferred, assigned (as applicable) or otherwise conveyed to Buyer free and clear of all Liens, claims (including setoff and recoupment), interests and encumbrances of any kind, with all such Liens to attach at Closing to the proceeds of sale of the Acquired Assets in the order of their priority, and with the same validity, priority, force and effect which they now have as against the Acquired Assets, subject to the rights, claims, defenses, and objections, if any, of the Debtor and all parties in interest with respect to such Liens.

10.     All persons or entities holding Liens, claims (including setoff and recoupment), interests or encumbrances of any kind in, to or against the Acquired Assets shall be, and they hereby are, forever barred from asserting such Liens, claims (including setoff and recoupment),

interests or encumbrances of any kind against Buyer, its successors and assigns or such Acquired Assets after Closing.

11.     No person shall take any action to prevent, interfere with or otherwise enjoin consummation of the transactions contemplated by the Agreement.

**Assumption and Assignment of Assigned Contracts and Assignment Procedures**

12.     The assumption and assignment of the Assigned Contracts are effective immediately upon entry of this order subject to an Assigned Contract's counterparty's objection to assumption or assignment to be filed before July 2, 2020.  If a party objects before July 2, 2020, the Court will conduct a hearing on the issues raised by the objection party, but only specifically on the limited issue of assumption, assignment, and Cure Costs. If a party does not object, assumption and assignment will be final and effective as of the entry of this Order and any right to objection to be waived.

13.     The Assignment Procedures are approved in their entirety and effective immediately upon entry of this Order.

14.     The Trustee is authorized to assume the Assigned Contracts and assign the Assigned Contracts to Buyer in accordance with the terms of the Agreement, the approved Assignment Procedures, and pursuant to and in compliance with section 365 of the Bankruptcy Code. Upon the entry of this Order and pursuant to the approved Assignment Procedures, the Assigned Contracts shall be deemed assumed by the Trustee and assigned to the Buyer free and clear of any successor liability, Liens, claims (including setoff and recoupment), interests or encumbrances of any kind. Upon entry of this Order and pursuant to the approved Assignment Procedures, all contract counterparties to the Assigned Contracts and persons or entities holding Liens, claims, interests or encumbrances of any kind in, to or against the Assigned Contracts shall

be, and they hereby are, forever barred from asserting such Liens, claims (including setoff and recoupment), interests or encumbrances of any kind against Buyer, its successors and assigns or such Assigned Contracts after Closing. Notwithstanding anything to the contrary in this Order or in the Agreement, any counterparty to an executory contract that did not receive adequate due process notice, may object to the assumption and assignment or cure amounts within 14 days of actual notice of the intention to assume and assign the contract, with applicable cure amounts if any.

15.     Notwithstanding anything to the contrary contained in this Order, with respect to the Huayou Contract (as defined in the Agreement), Buyer has agreed to and shall credit PT. Huayue Nickel Cobalt ("Huayue") with all payments to the Debtor (including, without limitation, the $2.1 million for prepayments made to the Debtor) and deliver those certain severe service ball valves, and related technical documentation, services and training under the Huayou Contract on a schedule acceptable to Huayue and Buyer and otherwise in accordance with the Huayou Contract in exchange for only the remaining payments due under the Huayou Contract.

16.     Notwithstanding any provision contained in the Agreement, the Seller shall pay Watson Grinding for finished products detailed in invoice nos. 039156, 039157, and 039153 (the "Invoices") between Seller and Watson Grinding out of the Purchase Price in the amount of $47,840.00. Upon the delivery of the Purchase Price to the Seller, Seller shall have three (3) Business Days to pay Watson Grinding the $47,840.00 amount owed under the Invoices. For the avoidance of doubt, nothing contained in this paragraph shall change, amend, or otherwise alter the Buyer's obligation to pay Cure Costs for the applicable Assigned Contracts pursuant to the Agreement.

## Miscellaneous Provisions

17.              The sale of the Acquired Assets (including the assumption and assignment of the

Assigned Contracts) pursuant to the Agreement qualifies as a "good faith" sale within the meaning of section 363(m) of the Bankruptcy Code, and the Buyer is a "good faith" purchaser for the purposes of such section. The Buyer shall not have any successor liability to the Debtor, the Trustee, the Estate, the Debtor's creditors, any of their respective successor or assigns, the Acquired Assets or in any way related to or arising from the transactions evidenced by the Agreement.

18.     If any person or entity that has filed financing statement, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing Liens, claims, interests or encumbrances of any kind against, under, to or in the Acquired Assets shall not have delivered to the Trustee prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfactions, or releases of all interests or claims that the person or entity has with respect to the Acquired Assets, then (a) the Trustee and Buyer are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Acquired Assets and (b) the Buyer is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Liens in the Acquired Assets of any kind or nature.

19.     The Agreement and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the Trustee and Buyer in accordance with the terms thereof without further order of the Court; provided, however, that any such modification, amendment or supplement is neither material nor changes the economic substance of the transactions contemplated hereby.

20.     In the absence of a stay of the effectiveness of this Order, in the event that the Buyer and the Trustee consummate the transactions contemplated by the Agreement at any time after entry of this Order, then with respect to the transactions approved and authorized herein, the Buyer,

as a purchaser in good faith within the meaning of section 363(m) of the Bankruptcy Code, shall be entitled to all of the protections of section 363(m) of the Bankruptcy Code in the event this Order or any authorization contained herein is reversed or modified on appeal.

21.     The terms of this Order and the Agreement shall be binding on the Trustee, the Buyer and the Estate's creditors and all other parties in interest, and any successors of the Debtor, the Trustee, the Estate, the Buyer and the Debtor's creditors, including any trustee or examiner appointed in this bankruptcy case or any subsequent or converted case of the Debtor under chapter 7 or chapter 11 of the Bankruptcy Code.

22.     The failure to include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of that provision, it being the intent of the Court and the Trustee and Buyer that the Agreement is hereby authorized in its entirety.

23.     Any conflict between the terms and provisions of this Order and the Agreement shall be resolved in favor of this Order.

24.     The provisions of Bankruptcy Rules 6004(h) and 6006(d) are hereby waived. This Order shall not be stayed for 10 days after its entry but shall be and hereby is effective immediately upon entry, and the Trustee and the Buyer are authorized to immediately execute, close, fund, fully perform all terms of the Agreement, consummate the transactions documented and contemplated by the Agreement, and take any and all actions necessary to implement and give effect to the terms of the Agreement upon entry of this Order. Time is of the essence in closing the transactions and the parties to the Agreement shall be authorized to close the sales as soon as possible consistent with the terms of the Agreement.

25.     The Assigned Contracts shall be transferred to and remain in full force and effect for the benefit of Buyer in accordance with their terms, notwithstanding any provision in any such contract that prohibits, restricts, or conditions such assignment or transfer pursuant to § 365(f) of

the Bankruptcy Code. There shall be no accelerations, assignment fees, increases, or any other fees charged to Buyer or the Trustee as a result of the assumption and assignment of the Assigned Contracts.

26.     Nothing in this Order releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit arising from or related to the enforcement of any applicable police or regulatory law or regulation (including but not limited to those of the (Texas Commission on Environmental Quality and the Texas Railroad Commission) to which any entity would be subject to as the owner or operator of property from and after the date of the closing of the Sale. Nothing in this Order authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police and regulatory law.

27.     "The ad valorem taxes for tax year 2020 prorated as of the Effective Time pertaining to the inventory and personal property shall become the responsibility of the Buyer upon the Effective Time. For the avoidance of doubt, the Seller shall be responsible for their portion of the ad valorem taxes for tax year 2020 up to the Effective Time, and Buyer shall be responsible for the ad valorem taxes for tax year 2020 after the Effective Time.  The 2020 ad valorem tax liens shall be retained against the Acquired Assets until said Taxes, including any penalties and interest that may accrue, are paid in full."

28.     The requirements set forth in Bankruptcy Local Rule 9013-1 and the Complex Case Procedures are satisfied by the contents of the Motion.

29.     The failure to include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of that provision, it being the intent of the Court and the Trustee and Buyer that the Agreement is hereby authorized in its entirety.

30.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed:  June 25, 2020

Marvin Isgur
United States Bankruptcy Judge

## **EXHIBIT A**

**(Agreement)**

EXECUTION VERSION

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**ROBERT E. OGLE, Chapter 11 Trustee for
WATSON VALVE SERVICES, INC., as Seller,**

**AND**

**MOGAS INDUSTRIES, INC., as Buyer**

**Dated as of June 19, 2020**

4826-8234-7709.11

# TABLE OF CONTENTS

Page

ARTICLE 1.   Purchase and Sale of Assets; Assumption of Certain Specified Liabilities............4
   1.1   The Acquired Assets ...........................................................................................4
   1.2   Excluded Assets ..................................................................................................7
   1.3   Assumption of Certain Liabilities;.....................................................................8
   1.4   Excluded Liabilities ............................................................................................9
   1.5   Intentionally Omitted .......................................................................................11
   1.6   Consents ............................................................................................................11
   1.7   Consideration and Closing Payment; Indebtedness...........................................11
   1.8   Bankruptcy Court Matters.................................................................................12

ARTICLE 2.   Closing; Deliveries of the Parties at Closing ........................................................14
   2.1   The Closing .......................................................................................................14
   2.2   Conditions Precedent to Obligation of Buyer ...................................................14
   2.3   Conditions Precedent to Obligation of Seller ...................................................15
   2.4   Seller Covenants ...............................................................................................16
   2.5   Buyer Covenants ...............................................................................................18
   2.6   Public Announcement ........................................................................................18
   2.7   Deliveries at the Closing by Seller....................................................................18
   2.8   Deliveries at the Closing by Buyer ...................................................................19
   2.9   Passage of Title .................................................................................................19
   2.10  Transfer Taxes, Etc ...........................................................................................19
   2.11  Right to Contest ................................................................................................19
   2.12  Fulfillment of Conditions and Agreements Prior to Closing .............................19
   2.13  Termination Prior to Closing ............................................................................20

ARTICLE 3.   Representations and Warranties of Seller ..............................................................22

ARTICLE 4.   Intentionally Omitted ...........................................................................................22

ARTICLE 5.   Representations and Warranties of Buyer..............................................................22
   5.1   Corporate Status; Authority ..............................................................................22
   5.2   Corporate Action; Authority; Execution............................................................22
   5.3   No Conflicts ......................................................................................................23
   5.4   Financing............................................................................................................23

ARTICLE 6.   Additional Agreements .........................................................................................23
   6.1   Cooperation .......................................................................................................23
   6.2   Employees..........................................................................................................23
   6.3   Taxes; Final Sales Tax Return ..........................................................................24
   6.4   Name Change .....................................................................................................24

ARTICLE 7.   Claims ..................................................................................................................25
   7.1   General Provisions ............................................................................................25
   7.2   Specific Performance ........................................................................................25

ARTICLE 8.   Miscellaneous ......................................................................................25
    8.1          Costs and Expenses.........................................................................25
    8.2          Binding Effect Assignments ..........................................................25
    8.3          Further Assurances..........................................................................25
    8.4          Notices ...........................................................................................25
    8.5          Amendment and Modification ........................................................26
    8.6          Captions .........................................................................................26
    8.7          Governing Law; Submission to Jurisdiction; Waivers ...................26
    8.8          Waiver of Provisions......................................................................27
    8.9          Execution of Agreement; Counterparts; Electronic Signatures ......27
    8.10        Entire Agreement...........................................................................28
    8.11        Schedules to the Agreement………………………………………28
    8.12        Bulk Sales Laws.............................................................................28
    8.13        Definitions; Construction...............................................................28
    8.14        No Third Party Beneficiaries .........................................................31

## **SCHEDULES**

Schedule 1.1(a)(i) - Inventory

Schedule 1.1(a)(ii) - Customer-Owned Property

Schedule 1.1(b) - Customer Prepayments and Covered Receivables

Schedule 1.1(e) - Equipment/Machines/Office Furniture

Schedule 1.1(f) - Intellectual Property

Schedule 1.1(g) - Licenses, Permits, and Authorizations

Schedule 1.1(h) - Assigned Contracts

Schedule 1.1(h)(iii) - Final Vendor Purchase Orders

Schedule 1.2(k) – Excluded Purchase Orders

Schedule 2.4(a) - Pre-Closing Transactions / Indebtedness Outside Ordinary Course of Business

4826-8234-7709.11

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**"), dated as of June 19, 2020, is entered into by and among Mogas Industries, Inc., a Texas corporation ("**Buyer**"), and Robert Ogle, as Chapter 11 Trustee for the bankruptcy estate of WATSON VALVE SERVICES, INC. ("**Seller**" or the "**Debtor**").  Seller and Buyer are sometimes referred to collectively herein as the "**Parties**" and individually as a "**Party**."

## RECITALS

WHEREAS, Seller, as trustee, owns and operates a business involving the manufacture, service, repair and rebuild of severe service ball valves, as well as related comprehensive valve services including, but not limited to, testing, cleaning, installation support and troubleshooting, disassembly, analysis, actuation system mounting/installation, and the sale of its own proprietary line of valve products (collectively, the "**Business**");

WHEREAS, Seller desires to sell, assign, and transfer to Buyer, and Buyer desires to purchase from Seller, certain of its assets, privileges, rights, and interests that are owned, used, or held for use by Seller in connection with the Business, all on the terms and subject to the conditions described in this Agreement and assume the Assigned Contracts (defined below), and Assumed Liabilities (defined below), upon the terms and conditions set forth herein.

WHEREAS, the Debtor commenced proceedings (Case No. 20-30968) (the "**Bankruptcy Case**") under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court at the Southern District of Texas (the "**Bankruptcy Court**") and Watson Grinding and Manufacturing Co. ("**Watson Grinding**") commenced proceedings (Case No. 20-30967) under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the foregoing two proceedings, collectively, the "**Bankruptcy Cases**");

WHEREAS, on June 4, 2020, the Bankruptcy Court entered an order appointing Seller as Chapter 11 trustee for Debtor vesting the Chapter 11 Trustee with the authority to sell assets of the Debtor, among other powers;

WHEREAS, the Seller and the Buyer desire to implement the purchase and sale and other transactions, assumptions, and assignments contemplated hereby pursuant to Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code and pursuant to the Final Sale Order (as defined below) to be entered in the Bankruptcy Case;

WHEREAS, this Agreement is subject to the approval of the Bankruptcy Court and will be consummated only under the Final Sale Order to be entered in the Bankruptcy Case.

NOW, THEREFORE, in reliance upon the recitals above (which are made a part of the agreements below) and in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties to this Agreement agree as follows:

## ARTICLE 1.
## Purchase and Sale of Assets; Assumption of Certain Specified Liabilities

1.1     The Acquired Assets.   Subject to and in reliance upon the representations, warranties, and agreements set forth in this Agreement, and subject to the terms and conditions contained in this Agreement and the Final Sale Order, Seller shall grant, convey, sell, assign, transfer, and deliver to Buyer on the Closing Date, and Buyer shall purchase on the Closing Date all of Seller's right, title, and interest in the following assets (the "**Acquired Assets**"), free and clear of (x) all covenants, restrictions, liens, security interests, claims, pledges, assignments, subleases, options, rights of refusal, charges, leases, licenses, encumbrances and any other restriction of any kind or nature (collectively, "**Liens**") and (y) free and clear of all Excluded Liabilities:

(a)     Inventory and Customer-Owned Property.

(i)     Inventories.   All inventories (including raw materials, work in progress, and finished goods) and supplies of Seller, including any such items held at the Seller's places of business including, but not limited to, inventories listed on Schedule 1.1(a)(i);

(ii)     Additional Inventory. Seller's interest in any work in progress inventory currently in the possession of Watson Grinding (the inventories described in Section 1.1(a)(i) and this Section 1.1(a)(ii), collectively, the "**Inventory**").

(iii)     Customer-Owned Property.   All customer-owned property held by Seller in accordance with the Purchase Orders or otherwise, but only to the extent of Seller's rights thereto ("**Customer-Owned Property**") including but not limited to those set forth on Schedule 1.1(a)(ii) attached hereto;

(b)     Customer Prepayments.   Solely to the extent identified in Schedule 1.1(b), prepayments, deposits, advances and the like by customers with respect to sales, services, or other transactions as to which delivery or performance has been fully completed as of the Closing Date under Final Customer Purchase Orders;

(c)     Covered Receivables.   Accounts receivable, notes receivable, and related rights of payment whether or not the underlying sales, services or other transactions have been fully performed (including profits to be earned from work in progress arising from or related to ongoing repair orders) as of the Closing Date (the "**Covered Receivables**"), including, but not limited to, the Covered Receivables identified in Schedule 1.1(c).

(i)     Buyer shall be responsible for the collection of any Covered Receivable after the Closing Date.

(d)     Prepaid Items; Deposits.   All prepaid items and expenses of Seller, and all security deposits held by third parties for the benefit of Seller;

(e)     Machinery, Equipment, and Other Personal Property.   All physical assets, machinery (including, without limitation, autoclave agitator blades and/or assemblies for

manufacture, repair and coating, equipment, presses, motor vehicles, racking, molds, forms, dies and tooling), spare parts, furniture, fixtures, office equipment and supplies, packing materials, computer hardware, photocopiers, facsimile machines, and other tangible personal property of every kind and description owned, leased (to the extent such lease(s) can be transferred to the Buyer), or licensed (to the extent such license(s) can be transferred to the Buyer) by Seller, including but not limited to all equipment on Seller's depreciation schedule and/or asset list (the "**Equipment**"), together with any express or implied warranty by the manufacturers or Seller or lessors of any item or component part thereof and all maintenance records and other documents relating thereto, including without limitation, the assets listed on Schedule 1.1(e) attached hereto;

(f)     Intellectual Property. All of Seller's rights and goodwill in and to,  and all rights, claims, and  causes of action against any third parties[1], arising from any misappropriation, wrongful use, disclosure or any other infringement of intellectual property rights of any kind or nature occurring prior to the Closing Date regarding trademarks, service marks, copyrights, copyright registrations, patents, patent registrations, trade names, domain names, slogans, logos, social-media assets, e-commerce assets, industrial models, methodologies, computer software (including but not limited to SOLIDWORKS, Inventor, Autocad, Global Shop,[2] and all software licenses), technical information, drawings and designs, customer lists, data associated with the Acquired Assets, know-how, show-how, and trade secrets, and other intangible rights, including any applications therefor, and licenses with respect thereto, whether or not subject to statutory registration or protection, including all of Seller's rights and goodwill in and to the name "Watson Valve" and any derivations thereof, including but not limited to designs, drawings, technical specifications, calculations, coating technology, and intellectual property as it relates to the coating, laboratory procedures, work instructions, and standards pertaining to and/or used in the operation of the Business (collectively, the "**Intellectual Property**") as listed on Schedule 1.1(f);

(g)     Permits, Licenses, and Authorizations.  All governmental permits, licenses, and authorizations held by Seller, including but not limited to those to be identified by Seller on Schedule 1.1(g) (to the extent the same may be transferred to Buyer);

(h)     Assigned Contracts and Cure Costs.  The Seller's Contracts consisting of the following (collectively, the "**Assigned Contracts**"):

(i)     Except for the Excluded Purchase Orders, the customer purchase orders of Seller that are outstanding for the purchase of products of Seller and repair services to be performed by Seller on Third Party products (the "**Final Customer Purchase Orders**"), including but not limited to those Final Customer Purchase Orders listed on Schedule 1.1(h) attached hereto;

---

[1] For the avoidance of doubt as to intellectual properties only, "third parties" does include any officer, director, or affiliate of Watson Valve.  The Seller shall retain any and all rights, claims, and causes of action against any and all directors and officers of Watson Valve, save and except for litigation dealing with any and all transfers of intellectual properties owned by Watson Valve.
[2] Inventor, Autocad and Global Shop are licensed under the name Watson Grinding, but the Debtor pays certain amounts for use of such licenses.

(ii)     Final Customer Purchase Orders includes, but is not limited to, that certain Procurement Contract No: MOR-203-009-0 of Severe Service Ball Valve for HUAYOU Indonesian Laterite-Nickel Ore Project between PT. Huayue Nickel Cobalt and Seller, dated April 25, 2019 (the "**HUAYOU Contract**").

(iii)     Except for the Excluded Purchase Orders, those certain vendor purchase orders of Seller that are outstanding for the purchase of products or services by Seller on the Closing Date as set forth on Schedule 1.1(h)(iii) attached hereto (the "**Final Vendor Purchase Orders**").  The Final Customer Purchase Orders and Final Vendor Purchase Orders will be referred to as the "**Purchase Orders**."  The "**Excluded Purchase Orders**" means those items listed on Schedule 1.2(k).

(iv)     All software licenses and related licenses listed on Schedule 1.1(h).

(i)     Files and Records.  Copies of all files, records, books of account, general, financial, and accounting records, invoices, computer programs, tapes, electronic data (including, without limitation, data relating to customers, sales history, inventory, accounts receivable, vendors, employees and accounts payable), processing software, all data of every kind or nature maintained on computer servers (together with computer backup devices) to which Seller has or had access in the ordinary course of business prior to and including the date of this Agreement, regardless of whether such computer servers are owned by Seller or Watson Grinding and Manufacturing Co., customer, supplier, and vendor lists and records, studies and reports of every kind or nature, advertising and sales material, test records, technical drawings, personnel and payroll records, correspondence, all other records that pertain directly to or are used in connection with the Business including, without limitation, access to and the right of Buyer to transfer to any platform designated by Buyer all records relating to the operations of Seller maintained on the Global Shop Solutions software platform, inspection and safety records, quality systems, all specifications standards and licenses and written procedures of every kind and nature.  Seller shall have the right to access the foregoing to the extent provided in Section 6.1 and Section 6.5;

(i)     Notwithstanding anything to the contrary in Section 1.1(i), Buyer understands and agrees that Seller may not have the right to sell or transfer—or make copies of—certain Third-Party software applications or platforms to the Buyer as identified by Seller on Schedule 1.1(h), and that it will be incumbent upon Buyer to separately obtain the right—at its own expense—to obtain and use such applications or platforms.

(j)     Guarantees.  All guarantees, warranties, indemnities, and similar rights in favor of Seller with respect to any of the Acquired Assets;

(k)     Access to Steffani Lane Premises and McKinney Premises.  Access to the work in progress of the Seller located at the premises at 5008 Steffani Lane, Houston, Texas (the "**Steffani Lane Premises**") and the ability of Buyer to complete such work in progress at the Steffani Lane Premises for a period of ninety (90) days after the Closing and access to the premises at 2910 McKinney, Houston, Texas up to and including 90 days from the date of the sale described herein; and

6

(l)     <u>Goodwill</u>.  All of Seller's goodwill in, and the going concern value of, the Business.

All of the foregoing will be included in the Acquired Assets and acquired by Buyer.

1.2     <u>Excluded Assets</u>.  The following shall be excluded from the Acquired Assets and retained by Seller, as applicable (collectively, the "**Excluded Assets**"):

(a)     <u>January 24, 2020 Explosion Event</u>. All of Seller's rights, claims, and causes of action related to or arising from the January 24, 2020 explosion event originating on the real property in Houston, Texas upon which Watson Grinding conducted its business operations at the time of the explosion (the "**Watson Grinding Explosion**"). This includes, but is not limited to, causes of action against Watson Grinding and any other potentially responsible parties.

(b)     <u>Employee Benefit Plans</u>.  All employee Benefit Plans, including, without limitation, employee pension, profit sharing 401(k), medical benefit or health plans and trusts, and related trust accounts, funds, insurance policies, investments, or other assets, and any sale bonus or retention agreements;

(c)     <u>Rights Arising from Excluded Assets and Excluded Liabilities</u>.  All rights, claims, causes of action, and credits (including all indemnities, warranties and similar rights) in favor of Seller to the extent arising out of or resulting from any Excluded Asset or any Excluded Liability, including, but not limited to: (i) all claims of causes of action against potentially responsible parties for the Watson Grinding Explosion consistent with Section 1.2(a); and (ii) any insurance claims relating to or arising from the Watson Grinding Explosion.

(d)     <u>Other Rights Retained by Seller</u>. All rights, claims, causes of action, and credits in favor of Seller arising from or relating to: (i) all avoidance claims, causes of action, or rights of recovery under Chapter 5 of the Bankruptcy Code or other similarly applicable state law available to the Trustee.

(e)     <u>Corporate and Other Records</u>.  All minute books, seal, stock records, tax returns and tax records, and all other books and records related to the Excluded Assets listed in <u>Section 1.2</u>;

(f)     <u>Transaction Rights</u>.  All rights that accrue or will accrue to Seller under the Transaction Agreements;

(g)     <u>Securities</u>.  All equity securities or other ownership interest of Seller and all equity securities or other ownership interest of any of such Seller's Affiliates;

(h)     <u>Utility Deposit</u>.  Any adequate assurance deposit under Section 366 of the Bankruptcy Code;

(i)     <u>Real Property</u>.  Any real estate, including but not limited to real estate located in Houston, Texas (the "**Houston Facilities**") other than Buyer's rights to access those leaseholds previously described herein; and

7

(j)      Insurance.  Any rights or causes of action related to insurance proceeds related to or arising from the Houston Facilities.

(k)      Excluded Purchase Orders. Those certain Excluded Purchase Orders set forth on Schedule 1.2(k).

1.3      Assumption of Certain Liabilities.  Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Buyer shall execute and deliver to Seller substantially in the form of Exhibit A-1 (the "**Assignment and Assumption Agreement**") pursuant to which Buyer shall assume and agree to discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), only the following Liabilities (collectively, the "**Assumed Liabilities**") and no others:

(a)      Assigned Contracts. All of the Seller's Liabilities under the Assigned Contracts as selected by the Buyer and included on Schedule 1.1(h) to the extent such Liabilities are attributable to periods from and after the Closing Date.

(i)      Schedule 1.1(h) sets forth each Executory Contract and Seller's good faith estimate of the amount of the Cure Costs payable in respect of each such Executory Contract (and if no Cure Cost is estimated to be payable in respect of any particular Executory Contract, the amount of such Cure Cost designated for such Contract shall be "$0.00"); provided; however, that in the event the actual Cure Cost is greater than an amount equal to one hundred twenty-five (125%) percent of Seller's good faith estimate of the amount of Cure Costs payable in respect of any such Executory Contract, then Buyer shall not be obligated to assume any such Executory Contract and shall notify Seller in writing of Buyer's election not to assume same;

(ii)      At the Closing (or, if the applicable Assigned Contract and Interest is not assigned to Buyer at Closing, then at the time of the assignment of such Assigned Contract and Interest to Buyer, if ever), Buyer shall pay, pursuant to Section 365 of the Bankruptcy Code and the Sale Order, any and all cure and reinstatement costs or expenses that are required to be paid under sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts and Interests (the "**Cure Costs**").  For the avoidance of doubt, the payment of any Cure Costs called for by this Agreement shall be made by Buyer when due under the terms of the respective Assigned Contract and shall be in addition to the Purchase Price but in no event shall Buyer be required to make any payment of Cure Costs for, and shall not assume any Liabilities with respect to, any Contract that is not an Assigned Contract or as to which Buyer has elected not to assume because the Cure Cost is greater than an amount equal to one hundred twenty-five (125%) percent of Seller's good faith estimate of the amount of Cure Costs payable in respect of any such Executory Contract (the "**Cure Costs Exceptions**");

(iii)      The Assigned Contracts shall be assumed by Seller and assigned to Buyer in accordance with the requirements of Section 365 of the Bankruptcy Code;

8

(b)      All Cure Costs save and except only the Cure Costs Exceptions;

(c)      Liabilities existing as of the Closing Date with respect to the HUAYOU Contract (the "**HUAYOU Liability**");

(d)      any express or implied product warranties related to products manufactured, or for any services provided, by Seller in the ordinary course of business, except for any warranty obligations related to the Watson Grinding Explosion (such warranties excluding those related to the Watson Grinding Explosion, the "**Prior Product Claims**");

(e)      all Liabilities for Taxes arising from or attributable to the Acquired Assets arising after the Closing Date;

(f)      Transfer Taxes.  All transfer Taxes described in Section 2.10; and

(g)      The assumption by Buyer of the Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.

1.4      Excluded Liabilities.  Buyer does not, and shall in no event assume or be deemed to assume, nor shall it be liable for, any Liabilities of Seller or the Acquired Assets of any kind or nature whatsoever (whether express or implied, fixed or contingent, known or unknown, or whether the Liabilities could be asserted against or imposed upon Buyer as successors or transferees of a Seller as an acquirer of the Acquired Assets under any legal principle) other than the Assumed Liabilities (all Liabilities of Seller other than the Assumed Liabilities are referred to herein collectively as the "**Excluded Liabilities**").

Without limiting the generality of the foregoing, Excluded Liabilities shall include:

(a)      Liabilities to, under or with respect to any Benefit Plan and the administration of any Benefit Plan, or relating to payroll, vacation, sick leave, workers' compensation, unemployment benefits with respect to employees or former employees of Seller or any of its predecessors, under any employment, severance, retention, or termination agreement with any employee of Seller, or arising out of or relating to any employee claim or allegation whether or not the affected employees are hired by Buyer, including any amounts payable under and sale bonus or retention agreements and/or any disputes related thereto or relating to injuries suffered by employees prior to the Closing Date;

(b)      any trade payables or any other Liability for any product or service provided to Seller on or before the Closing Date;

(c)      Liabilities relating to all Taxes arising as a result of Seller's operation of the Business or ownership of the Acquired Assets prior to the Effective Time, and Taxes based on net income or attributable to sales or use that are assessed, accrued, or attributable for periods on or prior to the Closing Date and related penalties and interest, if any, but excluding transfer Taxes, if any (which are addressed in Section 2.10 and Section 6.3);

9

(d)     Liabilities relating to any complaint, action, arbitration or regulatory, administrative, or government proceeding or investigation involving Seller or arising from actions of Seller or on or prior to the Closing Date;

(e)     all Indebtedness of Seller;

(f)     Liabilities arising out of any transaction affecting Seller and Liabilities incurred by Seller after the Closing Date;

(g)     any Liability to indemnify, defend, or hold harmless any of Seller's officers, directors, employees, or agents;

(h)     Liabilities of Seller or any of its predecessors arising out of or relating to any of the following matters:

(i)     any non-compliance with, or violation of, Environmental Laws existing on or prior to the Closing Date arising from or related to: (A) the ownership, use or operation of the Business, any property of the Business or any Acquired Assets; (B) the design, configuration or condition of any Equipment of the Business; (C) the failure to have or to comply with any material permits, registrations, or other governmental approvals required under applicable Environmental Laws; or (D) the failure to have, maintain or properly operate programs and equipment for monitoring of, or the failure to report in an accurate and timely manner any discharges, emissions or releases;

(ii)     any environmental condition that exists on, at, or under the Acquired Assets on or prior to the Closing Date and that is attributable to the period of ownership of Seller;

(iii)     the storage, transportation, treatment, disposal, discharge, recycling or Release of any Hazardous Material on or under or from the Business or Acquired Assets during or prior to Seller's ownership thereof or at any off-site location by Seller before the Closing Date, or the arrangement by Seller for any storage, transportation, treatment, disposal, discharge, recycling, or Release of any Hazardous Material at any off-site location on or prior to the Closing Date;

(iv)     any contractual indemnity obligations relating to requirements of Environmental Law or environmental Liabilities that Seller has undertaken in connection with the Business or the Acquired Assets;

(i)     any Liability of Seller under any contract that is not an Assigned Contract;

(j)     any Liability of Seller relating to and arising from the ownership or operation of the Acquired Assets or the Business prior to the Closing; provided however, that this Section 1.4(j) shall not be deemed to include the HUAYOU Liability or the Prior Product Claims;

10

(k)     any Liability of Seller arising out of or resulting from its compliance or noncompliance with any law, order, or regulation (except Environmental Laws, the Liabilities for which are governed by Section 1.4(h));

(l)     any Liability of Seller that could be or has been asserted or deemed in the Bankruptcy Cases or the basis of which arose or accrued on or prior to the Closing Date, regardless of whether so asserted or claimed;

(m)     any Liability of Seller to pay any fees or commissions to any broker or finder in connection with the transactions contemplated by this Agreement; and

(n)     any other Liability of Seller that is not an Assumed Liability, including without limitation any Liability relating to or arising out of the Watson Grinding Explosion.

1.5     Intentionally Omitted.

1.6     Consents.

(a)     Buyer acknowledges that the Final Sale Order will authorize the assumption and assignment of the Assigned Contracts without the requirement of any consent by the parties thereto, to the extent authorized by and in compliance with Section 365 of the Bankruptcy Code and/or the terms of the Bankruptcy Court's Final Sale Order.

(b)     To the extent any Assigned Contract is not assumable and assignable by Seller to Buyer under Section 365 of the Bankruptcy Code without the consent of the applicable counterparty thereto, Seller and Buyer shall use their commercially reasonable efforts prior to Closing to obtain all such consents of Third Parties which are required under Section 365 of the Bankruptcy Code for the consummation of the transactions contemplated hereby (without conditions that are materially adverse to Buyer) (the "**Required Consents**") as listed on Schedule 1.6(b).  All such Required Consents shall be in writing and executed counterparts thereof shall be delivered to Buyer on or before the Closing Date.

(c)     If a Required Consent is not obtained, or if an attempted assignment thereof would be ineffective or would affect the rights thereunder so that Buyer would not receive all such rights, Seller shall use its commercially reasonable efforts after Closing to provide to Buyer the benefits under any such Contract or any claim or right, including without limitation, enforcement for the benefit of Buyer of any and all rights of Seller against a Third Party thereto arising out of the default or cancellation by such Third Party or otherwise.  Seller shall continue to deal with the other contracting party or parties, with the benefits of such contract, property, right, or asset after the Closing Date accruing to the benefit of Buyer; Seller shall hold all related moneys received thereunder for the benefit of Buyer and shall pay the same to Buyer when received.  Notwithstanding the foregoing, if Seller does not obtain a Required Consent, Buyer shall not be required to assume (or deemed to have assumed) such Contract (and such Contract will not be an Assigned Contract, unless the Buyer otherwise consents in writing).

(d)     Nothing in this Section 1.6 shall be deemed a waiver by Buyer of its right to receive an effective assignment of the Acquired Assets on the Closing Date, nor shall this

Section 1.6 be deemed to constitute an agreement to exclude from the Acquired Assets any assets described in this Section 1.6.

1.7     Consideration and Purchase Price, Closing Deposit

(a)     Consideration.  Buyer shall purchase the Acquired Assets for aggregate consideration equal to $5,550,000.00, (the "**Purchase Price**") minus the Covered Receivables Adjustment (as defined below), if any (the "**Adjusted Purchase Price**"). Upon Closing, Buyer shall tender the Adjusted Purchase Price to the Seller.  Buyer shall also fund any Cure Costs to contract counterparties to the Assigned Contracts when due under the terms of the respective Assigned Contract.

(b)     Covered Receivables Adjustment. If the final amount of Covered Receivables as of the Closing Date (the "**Final Covered Receivables**") is less than ninety percent (90%) of the Covered Receivables reflected on Schedule 1.1(c) hereto, then the Purchase Price shall be adjusted downward by an amount equal to the difference between: (i) the amount of Covered Receivables reflected on Schedule 1.1(c) hereto; and (ii) the Final Covered Receivables (such difference, the "**Covered Receivables Adjustment**").

(c)     Closing Deposit.  Upon execution of this Agreement, the Buyer shall tender an amount equal to ten percent (10%) of the Purchase Price to the Seller (the "**Closing Deposit**") within one Business Day after the execution of this Agreement.

1.8     Bankruptcy Court Matters.

(a)     Approval of Motion for Sale.

(i)     Within three (3) Business Days following the date of this Agreement, Seller shall file with the Bankruptcy Court an emergency motion (the "**Sale Motion**") seeking an emergency hearing ("**Final Sale Order Hearing**") to approve the Final Sale Order as described in Section 1.8(b) (the date of such hearing, the "**Final Sale Order Hearing Date**") and find that an expedited hearing is required because of the exigent circumstances of the Seller's financial condition and the potential loss of the HUAYOU Contract.  Such Sale Motion and all exhibits thereto shall be in form and substance acceptable to Buyer, in its sole discretion.

(ii)     Seller shall promptly serve true and correct copies of the Sale Motion and all related pleadings in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules for the United States Bankruptcy Court for the Southern District of Texas and any other applicable order of the Bankruptcy Court, so that in each case the Final Sale Order Hearing properly and validly occurs on or before the Final Sale Order Hearing Date.

(b)     Final Sale Order.  At the Final Sale Order Hearing, the Bankruptcy Court will approve and enter a final sale order (the "**Final Sale Order**") that shall, among other things,

(i)     approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and direct the sale and assignment of the Acquired Assets to Buyer and approve

12

and direct the assumption and assignment of the Assigned Contracts to Buyer free and clear of all Liens (other than Permitted Liens), claims, encumbrances and Liabilities (other than Assumed Liabilities); provided that notwithstanding anything to the contrary in the Agreement, Buyer shall not be entitled to disapprove the Final Sale Order by reason of, and Buyer's obligation to consummate the transactions provided for herein shall not be conditioned upon the assumption and assignment of, any Assigned Contracts with respect to which the Bankruptcy Court determines that Buyer has failed to provide adequate assurance of future performance pursuant to Section 365 of the Bankruptcy Code;

(ii)     approve the execution, delivery and performance by Seller of all Transaction Agreements (defined below);

(iii)    approve the performance by Seller of its respective obligations under this Agreement;

(iv)    find that Buyer is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and grant Buyer the protections under such section;

(v)     find that Buyer is not deemed to be successor to Seller, to have, de facto or otherwise, merged with or into Seller or to be a mere continuation of Seller;

(vi)    find that the Purchase Price is a fair and reasonable price for the Acquired Assets;

(vii)   include a finding confirming the adequacy of notice to all creditors and parties in interest and parties to any executory contract, unexpired lease or right of entry;

(viii)  authorize the assumption and assignment of the Assigned Contracts without the requirement of any consent by the parties thereto subject to Section 1.6(b) of this Agreement;

(ix)    include provisions for the retention of jurisdiction in the Bankruptcy Court over matters relating to the transactions contemplated in this Agreement including matters relating to title to the Acquired Assets and claims against the Acquired Assets which arose or were based on facts or occurrences prior to the Closin; and

(x)     Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Final Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of: (A) demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code; and (B) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.

13

(c)     Contracts.   To the extent required under applicable Federal Rules of Bankruptcy Procedure and the Bankruptcy Code, Seller shall serve on all non-Seller counterparties to all of their Contracts a notice specifically stating that Seller is or may be seeking the assumption and assignment of such Contracts and shall notify such non-Seller counterparties of the deadline for objecting to any aspect of the proposed assumption and assignment of their Contracts to Buyer.

(d)     Certain Bankruptcy Undertakings by Seller.

(i)     Except as ordered by the Bankruptcy Court, Seller shall neither take any action, nor fail to take any action, which action or failure to act would reasonably be expected to prevent or impede the consummation of the transactions contemplated by this Agreement in accordance with the terms of this Agreement or result in: (i) the reversal, avoidance, revocation, vacating or modification (in any manner that would reasonably be expected to materially and adversely affect Buyer's rights hereunder); or (ii) the entry of a stay pending appeal.

(ii)     If the Final Sale Order or any other order of the Bankruptcy Court relating to this Agreement is appealed by any Person (or a petition for certiorari or motion for rehearing or re-argument shall be filed with respect thereto), Seller, with the reasonable cooperation of Buyer, shall take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion, and shall endeavor to obtain an expedited resolution of such appeal..

(iii)     The Closing shall not be consummated unless the Final Sale Order has been entered.

## ARTICLE 2.
## Closing; Deliveries of the Parties at Closing

2.1     The Closing.   The consummation of the transactions provided for in this Agreement (the "**Closing**"), which shall be deemed to occur at 12:01 a.m. Central Time (the "**Effective Time**") within two (2) Business Days of the date that all of the conditions precedent to Closing set forth in this Article 2 have been satisfied and the Bankruptcy Court has entered the Final Sale Order or on such other date as the Parties may agree ("**Closing Date**"), shall take place via telephonic conferencing and electronic exchange of signature pages, or at such other time or place as the Parties may agree.   The rights and obligations of the Parties if there is no Closing are set forth in Section 2.13.

2.2     Conditions Precedent to Obligation of Buyer.   The obligation of Buyer to proceed with the Closing is expressly subject to the fulfillment prior to or at Closing of the conditions precedent set forth in this Section 2.2.   Any one or more of these conditions precedent may be waived, in whole or in part, in writing by Buyer at Buyer's sole option.

(a)     Agreements.   Seller shall have performed in all material respects all of the agreements and covenants and complied with all of the provisions required by this Agreement and the Seller Transaction Documents to be performed or complied with by each such Party at or before the Closing Date, and the Schedules to this Agreement provided by Seller shall be true,

14

correct and complete in all material respects to the best of the Seller's Knowledge at the time of the Closing Date.[3]

(b) <u>Adverse Claims</u>.  Neither of the Parties shall have received any claim by any Person asserting that any Person other than Seller is the owner of any of the material Acquired Assets or is entitled to all or any portion of the Purchase Price (other than any lenders to be repaid at Closing as contemplated by this Agreement).

(c) <u>No Material Adverse Effect</u>.  Between the date of this Agreement and the Closing Date, no event or events shall have occurred that, individually or in the aggregate, has had or is reasonably likely to result in a Seller Material Adverse Effect.

(d) <u>Bankruptcy Matters</u>.  The Final Sale Order shall have been entered by the Bankruptcy Court and the Bankruptcy Court has waived the stay under Bankruptcy Rule 6004(h) to allow the parties to consummate the sale immediately (the "**Waiver**").

(e) <u>Closing Certificate</u>.  The Chapter 11 Trustee shall have delivered a certificate, dated as of the Closing Date, in a form satisfactory to Buyer, certifying to the fulfillment of the conditions set forth in subparagraphs <u>(a)</u>, <u>(b)</u>, <u>(c)</u>, <u>(d)</u>, <u>(f)</u>, and <u>(g)</u> of this <u>Section 2.2</u>.

(f) <u>Employment Payments</u>.  Buyer shall have received evidence reasonably satisfactory to Buyer that Seller, on or prior to the Closing Date, has paid all of its employees all salary, wages, bonuses (including pro rata share of any typical annual bonus) and other compensatory obligations from the date of filing of Chapter 11 through the Closing Date (including any that arise as a result of the Closing).

(g) <u>Closing Documents</u>.  Buyer shall have received the other agreements and documents referred to in <u>Section 2.7</u>.  All certificates and other documents delivered by Seller to Buyer under this Agreement shall be in form and substance satisfactory to Buyer.

2.3   Conditions Precedent to Obligation of Seller.  The obligation of Seller to proceed with the Closing is expressly subject to the fulfillment prior to or at Closing of the conditions precedent set forth in this <u>Section 2.3</u>.  Any one or more of these conditions may be waived, in whole or in part, in writing by Seller at the sole option of Seller.

(a) <u>Representations and Warranties</u>.  The representations and warranties of Buyer contained in <u>Article 5</u> shall be, individually and collectively, true and correct (in the case of any representation or warranty containing any materiality qualification) or true and correct in all material respects (in the case of any representation or warranty without any materiality qualification): (i) at and as of the date of this Agreement; and (ii) on and as of the Closing Date as if made on the Closing Date.

---

[3] Due to the January 24 Explosions, certain records and record-keeping methods have been interrupted.  In the event any specific Schedule is inaccurate, the Parties shall use reasonable efforts to address the inaccuracy and such inaccuracy shall not constitute a material breach.

(b)     Agreements.  Buyer shall have performed in all material respects all of the agreements and complied with all of the provisions required by this Agreement and the Buyer Transaction Documents to be performed or complied with by it at or before the Closing Date.

(c)     Litigation.  Neither of the Parties to this Agreement shall: (i) be subject to any restraining order or injunction restraining or prohibiting the consummation of the transactions contemplated by this Agreement; or (ii) have received written notice from any Governmental Entity of its intention to institute any action or proceeding seeking to restrain, enjoin, or nullify this Agreement or the transactions contemplated hereby.

(d)     Closing Certificate.  The Buyer shall have delivered a certificate, dated as of the Closing Date, in a form satisfactory to Seller, certifying to the fulfillment of the conditions set forth in subparagraphs (a), (b), (c), (e), and (f).

(e)     Bankruptcy Matters.  The Final Sale Order as contemplated by Section 1.8(b) shall have been entered by the Bankruptcy Court and shall be final and non-appealable and not have been reversed, stayed, modified, or amended.

(f)     Closing Documents.  Seller shall have received the documents and other items referred to in Section 2.8.

2.4     Seller Covenants.  Seller covenants and agrees as follows:

(a)     Pre-Closing Conduct of Business.  Between the date of this Agreement and the Closing Date, Seller shall perform its obligations under all Contracts and agreements relating to the Business in the usual and ordinary course of business and in accordance with existing policies and past practices, except as expressly contemplated by this Agreement. Without limiting the generality of the foregoing, except as disclosed on Schedule 2.4(a), Seller shall not (without the prior written consent of Buyer):

(i)     engage in any transaction outside the ordinary course of Business or in a manner inconsistent with past practice, or enter into, terminate, or amend or modify, any Contract in which Seller is a party;

(ii)     incur, commit to incur or maintain any Indebtedness outside the ordinary course of Business or in a manner inconsistent with past practice;

(iii)     assume, guarantee, endorse or otherwise become responsible for the obligations of any other Person or make any loans or advances to any Person;

(iv)     issue, sell, pledge, lease, dispose of, encumber, or authorize the issuance, sale, pledge, lease, disposition or encumbrance of: (A) any shares of capital stock of any class or any options, warrants, convertible securities or other rights of any kind to acquire any shares of capital stock, or any other ownership interest, of Seller; or (B) any assets that are material, individually or in the aggregate, to the Business except for the sales of Inventory in the ordinary course of business and in a manner consistent with past practice;

16

(v)   grant or pay any bonus, increases in compensation, incentive compensation or other employee benefit to, or enter into any contract with, its officers or its employees, except for in the ordinary course and consistent with past practices or pursuant to this Agreement;

(vi)   initiate, settle or compromise any material claims or litigation or, except in the ordinary and usual course of business, waive, release or assign any material rights or claims; or

(vii)   permit any insurance policy naming Seller as a beneficiary or a loss payable payee to be canceled or terminated.

(b)   <u>Business and Goodwill</u>.  Prior to the Closing Date, Seller shall use its commercially reasonable efforts to preserve intact the Business, to preserve and maintain Seller's goodwill and business relationships with customers, suppliers, employees and others having business relations with it, and to maintain in full force and effect and to protect and enforce, each in accordance with past practices, all permits, licenses, authorizations and Intellectual Property rights of Seller.

(c)   <u>Insurance</u>.  Seller shall maintain, or cause to be maintained, in full force and effect, through the Closing, all of the insurance policies of or covering Seller, its Business, the Acquired Assets and its employees in effect on the date hereof, unless replaced by substantially comparable coverage.  Seller shall promptly advise Buyer in writing of any fire, accident, or other casualty or loss occurring prior to the Closing Date, which individually or in the aggregate adversely affects the value of the Acquired Assets in an amount in excess of $25,000.

(d)   <u>Access to Properties, Facilities, Files, and Records</u>.  At the reasonable request of Buyer and upon reasonable advance notice, Seller shall, during normal business hours, give or cause to be given to Buyer and the Representatives of Buyer: (i) full access to the management personnel, property, accounts, books, deeds, title papers, insurance policies, licenses, agreements, contracts, commitments, logs, records and files of every character, related to the equipment, machinery, fixtures, furniture, vehicles and notes and accounts payable and receivable, and (ii) all such other information as Buyer may reasonably request, all as it relates to the Business.  Buyer shall have the right to have the tangible personal property included within the Acquired Assets inspected by Buyer or Buyer's Representatives for purposes of determining the physical condition and legal characteristics of the tangible personal property.  Prior to the entry of the Final Sale Order, as Buyer may reasonably request, Seller will cooperate with Buyer for the purpose of permitting Buyer and its Representatives to discuss the business, prospects and assets of Seller with Seller's key employees, customers, counsel, and accounting firm.  For the avoidance of doubt, other than with respect to any notice required to be given to Seller and as a precondition to any inspection, review, assessment, interview, test or audit (each an "**Assessment**"), which may be conducted by Buyer or its Representatives pursuant to this Agreement, Buyer and its Representatives shall coordinate and communicate directly with the Representatives of Seller and in connection with the scheduling and undertaking, and the disclosure of the outcome or results, of any such Assessment. Notwithstanding the foregoing or any other provision of this Agreement, nothing in this Agreement shall require Seller to disclose

17

or make available to Buyer any information subject to the attorney-client, attorney work product, consulting-only expert, or similar privilege.

(e)     Notice of Proceedings.  Seller shall promptly notify Buyer telephonically and in writing upon Seller: (i) becoming aware of any order or decree or any complaint praying for an order or decree restraining or enjoining the consummation of this Agreement or the transactions contemplated hereunder: or (ii) receiving any notice from any Governmental Entity or the Bankruptcy Court of its intention: (A) to institute an investigation into, or institute a suit or proceeding to restrain or enjoin, the consummation of this Agreement or such transactions; or (B) to nullify or render ineffective this Agreement or such transactions if consummated.

2.5     Buyer Covenants.  Buyer covenants and agrees to promptly notify Seller telephonically and in writing upon Buyer: (a) becoming aware of any order or decree or any complaint praying for an order or decree restraining or enjoining the consummation of this Agreement or the transactions contemplated hereunder; or (b) receiving any notice from any Governmental Entity of its intention (i) to institute an investigation into, or institute a suit or proceeding to restrain or enjoin, the consummation of this Agreement or such transactions, or (ii) to nullify or render ineffective this Agreement or such transactions if consummated.

2.6     Public Announcement.  Subject to the provisions of the Bankruptcy Code and Seller's right to make such filings and disclosures as it in good faith deems necessary or appropriate in connection with the Bankruptcy Case, neither Party hereto shall make or issue, or cause to be made or issued, any public announcement or written statement concerning this Agreement or the transactions contemplated hereby, without the prior written consent of the other Party hereto (which will not be unreasonably withheld or delayed), unless counsel to such Party advises that such announcement or statement is required by law (such as an obligation to disclose under federal securities laws of the United States), in which case the Parties hereto shall make reasonable efforts to consult with each other prior to such required announcement

2.7     Deliveries at the Closing by Seller.  At the Closing, Seller shall deliver, or cause to be delivered, to Buyer (unless delivered previously):

(a)     the Assignment and Assumption Agreement;

(b)     a Bill of Sale in substantially the form of Exhibit B-1 attached hereto (the "**Bill of Sale**"), together with assignments, certificates of title and other instruments of sale, transfer, and assignment in form and substance reasonably satisfactory to Buyer and its counsel sufficient to sell, transfer, and assign to Buyer all right, title, and interest of Seller and good and valid title to Seller's interest in and to the Acquired Assets;

(c)     Intentionally Omitted;

(d)     certificates of title to all motor vehicle(s) included in the Acquired Assets (if any), duly endorsed for transfer to Buyer as of the Closing Date;

(e)     Buyer shall have received on the Closing Date a certificate, as contemplated under and meeting the requirements of section 1.1445-2(b)(2)(i) of the Treasury

18

Regulations, to the effect that Seller is not a foreign person within the meaning of the Code and applicable Treasury Regulations;

(f)     a certificate from the Chapter 11 Trustee, in a form and substance reasonably satisfactory to Buyer, setting forth the aggregate amount of Indebtedness of Seller as of the Closing Date; and

(g)     such other documents or instruments as Buyer or its counsel may request that are reasonably required to be delivered by Seller at or prior to Closing pursuant to this Agreement or otherwise required in connection herewith (such items referred to in clauses (a), (b), (d), (e), and (f) above, together with this Agreement are collectively referred to as the "**Seller Transaction Documents**").

2.8     Deliveries at the Closing by Buyer.  At the Closing, Buyer shall deliver to Seller (unless delivered previously):

(a)     a counterpart to the Assignment and Assumption Agreement, duly executed by Buyer;

(b)     the Adjusted Purchase Price, payable in accordance with Section 1.7; and

(c)     such other documents or instruments as Seller or its counsel may request that are reasonably required to be delivered by Buyer at Closing pursuant to this Agreement or otherwise required in connection herewith (such items referred to in clauses (a) through (b) above, together with this Agreement are collectively referred to as the "**Buyer Transaction Documents**").

2.9     Passage of Title.  Title to all Acquired Assets shall pass from Seller to Buyer at Closing, subject to the terms and conditions of this Agreement.

2.10     Transfer Taxes. Buyer shall pay any transfer Taxes incurred in connection with the transfer of the Acquired Assets from Seller to Buyer in connection with this Agreement.

2.11     Right to Contest.  The assumption and agreement by Buyer to pay, perform, and discharge the Assumed Liabilities shall not prohibit Buyer from contesting with a Third Party the amount, validity, or enforceability of any liability thereof.

2.12     Fulfillment of Conditions and Agreements Prior to Closing.  Each Party shall use commercially reasonable efforts to satisfy all of those conditions to the obligations of the other under this Article 2 that are not beyond its reasonable control prior to the Closing Date.  Each Party shall use commercially reasonable efforts to take, or cause to be taken, all action and do, or cause to be done, all things necessary, proper or advisable, including making or obtaining any and all consents and authorizations, to consummate and make effective the transactions contemplated by this Agreement, including making all filings required under applicable law. Notwithstanding the foregoing, Buyer shall not be required to take any action to comply with any legal requirement or agree to the imposition of any Governmental Entity order, judgment, or decree that would: (a) prohibit or restrict the ownership or operation by Buyer of any portion of

the Acquired Assets; (b) compel Buyer to dispose of or hold separate any portion of its assets; or (c) impose any limitation on the ability of Buyer to own or operate the Business.

2.13    Termination Prior to Closing.

(a)    <u>Events of Termination</u>.  This Agreement may be terminated in writing at any time prior to the Closing as follows:

(i)    by the mutual consent of Buyer, on the one hand, and Seller on the other hand;

(ii)    by written notice from Buyer, if any of the conditions specified in <u>Section 2.2</u> shall not have been fulfilled (or if satisfaction becomes impossible) by the Closing Date and shall not have been waived by Buyer; provided further, however, that Buyer shall not be permitted to terminate this Agreement pursuant to this <u>Section 2.13(a)(ii)</u> if Buyer is in material breach of this Agreement;

(iii)    by written notice from Seller, if any of the conditions specified in <u>Section 2.3</u> shall not have been fulfilled (or if satisfaction becomes impossible) by the Closing Date and shall not have been waived by Seller; provided further, however, that Seller shall not be permitted to terminate this Agreement pursuant to this <u>Section 2.13(a)(iii)</u> if Seller is in material breach of this Agreement;

(iv)    by written notice from Buyer if: (A) Seller seeks to have the Bankruptcy Court enter an order dismissing, or converting the Bankruptcy Case into a case under chapter 7 of the Bankruptcy Code; or (B) an order of dismissal or conversion of the Bankruptcy Case is entered for any reason and is not reversed or vacated within fourteen (14) days after entry thereof;

(v)    by written notice from Buyer, if: (A) the Final Sale Order shall not have been approved and entered by the Bankruptcy Court by the close of business on the second Business Day following the Final Sale Order Hearing Date; or (B) the Final Sale Order fails to contain substantially the same provisions as described in <u>Section 1.8(b)</u> (or as may be approved by Buyer in its sole discretion);

(vi)    by written notice from Buyer, if: (A) the Bankruptcy Court issues an order granting leave to any Person to commence an appeal of the Final Sale Order; or (B) following its entry, the Final Sale Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any respect without the prior written consent of Buyer in its sole discretion;

(vii)    by written notice from Buyer if: (A) the Final Sale Order does not provide for the Waiver; or (B) without Buyer's prior written consent in its sole discretion and if it so consents then by written notice from Buyer if the Final Sale Order has not become final and non-appealable;

20

(viii)   by written notice from Buyer, if a material breach of any provision of this Agreement has been committed by Seller and such breach has not been cured or waived by Buyer after prior written notice and reasonable opportunity to cure;

(ix)   by written notice from Seller, if a material breach of any provision of this Agreement has been committed by Buyer and such breach has not been cured or waived by Seller after prior written notice and reasonable opportunity to cure;

(x)   by written notice from the Seller or Buyer, if there is in effect a final order of a Governmental Entity of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement; it being agreed that at the request of the Buyer, the Parties will promptly appeal any adverse determination which is not non-appealable and pursue such appeal with reasonable diligence unless and until this Agreement is terminated pursuant to any other provisions of this Section 2.13(a).

Each power in this Section 2.13(a) pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such power.  If more than one of the termination powers set forth in this Section 2.13(a) are applicable, the applicable Party shall have the right to choose the termination power pursuant to which this Agreement is to be terminated. The Parties acknowledge and agree that no notice of termination of the Closing Date provided pursuant to this Section 2.13(a) shall become effective until two (2) Business Days after the delivery of such notice to the other Party, and only if such notice shall not have been withdrawn during such two (2) Business Day period.

(b)   Consequences of Termination and Closing Deposit

(i)   If this Agreement is terminated by mutual consent of Seller and Buyer, no Party hereto shall have any obligation to any other Party as a result of that termination.

(ii)   If any Party terminates this Agreement for any reason other than as described in Section 2.13(a)(i), Section 2.13(a)(iv), Section 2.13(a)(v), Section 2.13(a)(vi), Section 2.13(a)(vii), or Section 2.13(a)(x), Buyer, on the one hand, and Seller, on the other hand, may be liable to the other for any material breach of this Agreement by such Party which breach led to such termination.  Each Party shall also be entitled to any other remedy to which it may be entitled at law or in equity, including injunctive relief and specific performance, in the event of a termination of this Agreement that is not in accordance with Section 2.13(a), all of which remedies hereunder are cumulative and are not exclusive of any other remedies.

(iii)   If the Closing does not occur on or before the Closing Date and no Party's material breach of this Agreement was the cause of the failure to close by that date (and such Party is otherwise complying with all of its obligations under this Agreement), then no Party shall have any Liability to the other Party under this Agreement, this Agreement shall terminate, and Seller shall promptly refund the Closing Deposit to Buyer.

21

(iv)    Notwithstanding anything contained in <u>Section 1.7(b)</u> or <u>Section 2.13(b)</u>, if the Buyer does not close the transaction contemplated by this Agreement within five (5) Business Days following the Bankruptcy Court's entry of the Final Sale Order approving the Agreement and related transactions, then the Buyer loses any and all rights to the Closing Deposit and such amount shall remain with the Seller except in an event of force majeure or other reason beyond the reasonable control of Buyer in which event the Closing Deposit will be refunded to Buyer.  Notwithstanding the forgoing subsection, if the transaction fails to close due to a termination events listed in Section 2.13(a)(i), (ii), (iv), (v), (vi), (vii), (viii), or (x), then the Closing Deposit shall be returned to the Buyer.

(v)    If the Buyer does close within five (5) Business Days of the Bankruptcy Court's entry of an order approving the transaction contemplated in this Agreement, then the Closing Deposit will be credited to the Adjusted Purchase Price.

All rights and obligations of the Parties set forth in this <u>Section 2.13</u> and <u>Article 8</u>, and the Final Sale Order (if entered) shall survive termination of this Agreement.

**ARTICLE 3.**
**<u>Representations and Warranties of Seller</u>**

Buyer will accept the Acquired Assets at the Closing and assume the Assumed Liabilities at the Closing "AS IS," "WHERE IS" AND "WITH ALL FAULTS."

**ARTICLE 4.**
**<u>Intentionally Omitted</u>**

**ARTICLE 5.**
**<u>Representations and Warranties of Buyer</u>**

Buyer separately represents to Seller as follows:

5.1    Corporate Status; Authority.  Buyer is a Texas corporation duly formed, validly existing and in good standing under the laws of the State of Texas.  Buyer is duly qualified and in good standing to do business in each jurisdiction in which the conduct or nature of its business or the ownership, leasing or holding of its properties makes such qualification necessary, except such jurisdictions where the failure to be so qualified or in good standing, individually or in the aggregate, would not reasonably be expected to have a material adverse effect on the ability of Buyer to perform its obligations under or to consummate the transactions contemplated by this Agreement.  Buyer has all requisite power to carry on its business as it is now being conducted, to own and operate such business and Buyer has all requisite power to enter into this Agreement and the Buyer Transaction Documents, to perform its obligations hereunder and to complete the transactions contemplated hereby.

5.2    Corporate Action; Authority; Execution.  All organizational proceedings necessary to be taken by or on the part of Buyer in connection with the transactions contemplated by this Agreement and the Buyer Transaction Documents have been duly and validly taken.  The execution, delivery and performance of Buyer of this Agreement and each of the other Buyer

22

Transaction Documents and the consummation of the transactions contemplated hereby have been duly and validly authorized, executed and delivered by Buyer and (assuming due authorization, execution, and delivery by Seller) will constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer, in accordance with and subject to its terms, except as may be limited by bankruptcy, insolvency, reorganization, or other laws affecting creditors' rights generally and by general equitable principles.

5.3     No Conflicts.  Neither the execution, delivery and performance by Buyer of this Agreement or any of the Buyer Transaction Documents, nor the consummation by Buyer of the transactions contemplated hereby or thereby is an event that, by itself or with the giving of notice or the passage of time or both, will: (a) conflict with the organizational documents of Buyer; (b) constitute a violation of, or result in any breach of or any default under, or constitute grounds for termination or acceleration of, any material mortgage, indenture, lease, contract, agreement or instrument to which Buyer is a party or by which it is bound; or (c) violate (i) any judgment, decree or order, or (ii) any statute, rule or regulation, in each such case, applicable to Buyer. Except with respect to the Final Sale Order, the execution, delivery and performance by Buyer of this Agreement, and the consummation by Buyer of the transactions contemplated hereby, require no action by or in respect of, or filing with, any Governmental Entity other than the Bankruptcy Court.

5.4     Financing.  As of the Closing Date, Buyer will have cash and available credit facilities in an aggregate amount sufficient to pay the Adjusted Purchase Price as required by this Agreement and any associated Cure Costs with Assigned Contracts.  Buyer's obligations hereunder are not conditioned upon Buyer's obtaining financing from any source.

### ARTICLE 6.
### Additional Agreements

6.1     Cooperation.  Subject to the final sentence of Section 2.4(d), Seller agrees to furnish to Buyer, and Buyer agrees to furnish to Seller, upon request as promptly as practicable, such information and assistance relating to the Acquired Assets and the Business, and with access to the books, files, records, data, and any other tangible and intangible items transferred pursuant to Section 1.1(i) as is reasonably necessary for the filing of any tax return, declaration or report, the making of any election related to Taxes, the preparation for any audit by any taxing authority, or the prosecution or defense of any claim, suit, or proceeding, or the winding up of their affairs (which information shall be maintained confidentially).  Seller and Buyer shall cooperate fully as to and to the extent reasonably requested, in the conduct of any audit, litigation or other proceeding to the extent relevant to the Acquired Assets of the Business.

6.2     Employees.

Buyer shall have no Liability for any costs or Liabilities arising from any employee's termination of employment with the Seller, including but not limited to costs and Liabilities attributable to Seller's employees (including without limitation, any severance payments resulting therefrom and continued group health plan benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**") on and after the Closing Date to any Seller employee or eligible dependent of a Seller employee).  In the event that Buyer or one of its

Affiliates incurs any Liability or expense as a result of being required to provide COBRA continuation coverage to an "M&A qualified beneficiary" (within the meaning of Treasury Regulation Section 54.4980B—9) from and after the Closing Date, Seller will reimburse Buyer or Buyer's Affiliate for any costs and expenses incurred by Buyer and Buyer's Affiliate in connection with providing such COBRA coverage, including, without limitation, third party administrative fees and charges incurred with respect to the administration and maintenance of the COBRA coverage described hereunder.  Nothing in this <u>Section 6.2</u> shall be construed as a guaranty of employment for any period of time.

      6.3     Taxes; Final Sales Tax Return.

      (a)     <u>Taxes</u>.  Seller shall be responsible for all Taxes in connection with, relating to or arising out of the Business or the ownership of the Acquired Assets, or the Assumed Liabilities attributable to taxable periods, or portions thereof, ending on or before the Closing, which Taxes shall be an Excluded Liability.  All state and local sales and use Taxes, to the extent attributable to periods prior to the Closing, shall be paid or otherwise discharged by Seller, including any and all sales or transfer taxes incurred or owed as a result of the transactions contemplated by this Agreement.

      (b)     <u>Filings and Cooperation</u>.

      (i)     Seller shall be responsible for filing or causing to be filed and paying all federal income Taxes of or payable by Seller and all state, local, provincial and foreign income Taxes with respect to which Seller is required to file for all taxable periods ending on or prior to the Closing Date.

      (ii)     Seller and Buyer shall: (A) provide the other with such assistance as may reasonably be requested by either of them in connection with the preparation of any tax return, any audit or other examination by any taxing authority or any judicial or administrative proceeding with respect to Taxes; (B) retain and provide the other with any records or other information which may be relevant to such return, audit, examination or proceeding; and (C) provide the other with any final determination of any such audit or examination proceeding or determination that affects any amount required to be shown on any tax return of the other for any period (which shall be maintained confidentially).

      6.4     Name Change.  As promptly as practicable after the Closing Date, Seller shall file in all jurisdictions in which it is qualified to do business any documents necessary to reflect such change of name to a name not including the word "Watson" or to terminate its qualification therein.

      6.5     Maintenance of Data Post-Closing.  Buyer agrees to maintain all data acquired as part of the Acquired Assets pertaining to the Watson Grinding Explosion and resulting litigation (the "**Litigation**") in retrievable form upon prior written request by Seller and interested parties from and after the Closing Date until the conclusion of the Litigation by trial or other final resolution.

## ARTICLE 7.
## Claims

7.1     General Provisions.   The representations, warranties and, to the extent performable after Closing, covenants set forth in this Agreement shall survive the Closing.

7.2     Specific Performance.   Seller, on the one hand and Buyer, on the other hand, acknowledge that the rights of the other Party to consummate the transactions contemplated hereby are unique and recognize and affirm that in the event of a breach of this Agreement by Seller or Buyer, as the case may be, money damages may be inadequate and the non-breaching Party may have no adequate remedy at law.   Accordingly, the Parties agree that such non-breaching Party shall have the right, in addition to any other rights and remedies existing in its favor at law or in equity, to enforce its rights and the other Party's obligations hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive or other equitable relief (without posting of bond or other security).

## ARTICLE 8.
## Miscellaneous

8.1     Costs and Expenses.   Each Party hereto shall bear all of its expenses incurred in connection with the transactions contemplated by this Agreement, including, without limitation, accounting, legal and financial advisory fees and expenses incurred in connection herewith.

8.2     Binding Effect Assignments.   This Agreement shall be binding upon Buyer and the Final Sale Order, Seller, and inure to the benefit of the Parties and their respective successors and permitted assigns and any successor Chapter 7 case.

8.3     No Assignment.   No Party hereto may assign any of its rights or delegate any of its duties hereunder without the prior written consent of the other Party, and any such attempted assignment or delegation without such consent shall be void and of no force and effect. Notwithstanding the foregoing, Buyer shall have the right to assign its rights and delegate its duties under this Agreement to: (a) any of its Affiliates; or (b) any other Person or entity, provided that such Person or entity acquires (whether by merger, operation of law, or otherwise) all or substantially all of Buyer's assets, and provided, further, that, in either case, no assignment shall relieve Buyer of any of its obligations hereunder.

8.3     Further Assurances.   The Parties shall from time to time do and perform such additional acts and execute and deliver such additional documents and instruments as may be required or reasonably requested by any Party to establish, maintain or protect its rights and remedies or to effect the purpose of this Agreement.

8.4     Notices.   Notices and other communications required or provided for herein shall be in writing (which shall include notice by facsimile transmission) and shall be deemed to have been duly given and received: (a) upon receipt, when delivered by hand or personal delivery; (b) upon transmission, when sent by facsimile transmission (with written confirmation of successful transmission); (c) on the second Business Day after the date of mailing, if delivered by a nationally recognized overnight delivery service (receipt requested); or (d) upon receipt, if delivered by certified or registered mail (receipt requested), in each case addressed as follows:

If to Seller:

> Robert Ogle
> 711 Louisiana Street
> Suite 2100
> Houston, Texas 77002
> Email: Bogle@theclarogroup.com

with a copy to:

> Jarrod Martin, Esq.
> Chamberlain Hrdlicka
> 1200 Smith St Suite 1400,
> Houston, TX 77002
> Email: Jarrod.Martin@chamberlainlaw.com

> Matthew Okin
> Okin Adams LLP
> 1113 Vine Street, Suite 240
> Houston, TX 77002
> Email: mokin@okinadams.com

If to Buyer:

> MOGAS Industries, Inc.
> c/o Matt Mogas
> 14204 E. Hardy Street
> Houston, Texas 77039
> E-mail:  mmogas@mogas.com

with a copy to:

> Susan E. Pravda
> Foley & Lardner LLP
> 111 Huntington Avenue, Suite 2500
> Boston, MA 02199-7610
> E-mail:  SPravda@foley.com

or to such other address as a Party may from time to time designate in writing to each of the other Parties in accordance with this Section 8.4.    All notices, demands and other communications hereunder may be given by other means (including telecopy or electronic mail), but will not be deemed to have been duly given unless and until it is actually received by the intended recipient.

  8.5 Amendment and Modification.  This Agreement may be amended, modified, or supplemented at any time after the Closing Date but only by the written and executed agreement of both Parties hereto.

4826-8234-7709.11

8.6     Captions.   The captions of Articles and Sections of this Agreement are for convenience only and shall not control or affect the meaning or construction of any of the provisions of this Agreement.

8.7     Governing Law; Submission to Jurisdiction; Waivers.

(a)     EXCEPT TO THE EXTENT THE MANDATORY PROVISIONS OF THE BANKRUPTCY CODE APPLY, THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY IN SUCH STATE WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OR CHOICE OF LAWS OR ANY OTHER LAW THAT WOULD MAKE THE LAWS OF ANY OTHER JURISDICTION OTHER THAN THE STATE OF TEXAS APPLICABLE HERETO.

(b)     Without limitation of any Party's right to appeal any Order of the Bankruptcy Court: (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby; and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding; *provided*, *however*, that, if the Bankruptcy Case is closed, all actions and proceedings arising out of or relating to this Agreement shall be heard and determined in a Texas federal court sitting in Houston, Texas, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding. The Parties consent to service of process by mail (in accordance with Section 8.4) or any other manner permitted by legal requirement.

(h)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LEGAL REQUIREMENTS, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR ANY OTHER AGREEMENT CONTEMPLATED HERETO AND THERETO OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY (i) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (ii) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

8.8     Waiver of Provisions.   No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, condition, covenant or agreement contained herein.   The failure of any Party at any time or times to require performance

27

of any provision of this Agreement shall in no manner affect the right of such Party at a later date to enforce the same.  No waiver by any Party of any condition or the breach of any provision, term, covenant, representation or warranty contained in this Agreement, whether by conduct or otherwise, in any one or more instances shall be deemed to be or construed as a further or continuing waiver of any such condition or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

8.9     Execution of Agreement; Counterparts; Electronic Signatures.

(a)     This Agreement and any amendment hereto may be executed in one or more counterparts and by different Parties in separate counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by facsimile or other electronic means (including portable document format sent via email) shall be as effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

(b)     The exchange of copies of this Agreement and of signature pages by facsimile transmissions (whether directly from one facsimile device to another by means of a dial-up connection or whether mediated by the worldwide web), by electronic mail in "portable document format" (aka ".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by combination of such means, shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the Parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

8.10     Entire Agreement.  This Agreement, including the Schedules and Exhibits hereto (which are incorporated herein by reference), the Bill of Sale, the Assignment and Assumption Agreement, the Final Sale Order, collectively, the "**Transaction Agreements**") constitute the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede, cancel, and replace any and all prior or contemporaneous agreements, understandings, and negotiations between the Parties and constitute a complete and exclusive statement of the terms of the agreement between and among the Parties with respect to the subject matter hereof.

8.11     Schedules to the Agreement.  True, complete, and accurate schedules to this Agreement shall be delivered to the Buyer at least three (3) Business Days prior to the Closing Date.

8.12     Bulk Sales Laws.  Each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" and all other similar laws in all applicable jurisdiction in respect of the transactions contemplated by this Agreement.

8.13     Definitions; Construction.

(a)     As used herein, the following terms shall have the following meanings:

28

"**Affiliate**" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under the direct or indirect common control with such specified Person.

"**Business Day**" and "**Business Days**" mean any calendar day(s) except any Saturday, any Sunday, any day which is a federal legal holiday in the United States or any day on which banking institutions in the State of Texas are authorized or required by law or other governmental action to close.

"**Contract**" means any contract, lease, license, purchase order, indenture, agreement, commitment, or other contractual arrangement, whether oral or written, express or implied.

"**Environmental Laws**" means any federal, state, or local legal requirement relating to the prevention of pollution, remediation of contamination, protection of the environment and natural resources, and restoration of environmental quality, including the following federal statutes and the regulations promulgated thereunder: (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980; (ii) the Emergency Planning and Community Right-To-Know Act; (iii) the Resources Conservation and Recovery Act; (iv) the Clean Air Act; (v) the Clean Water Act; (vi) the Safe Drinking Water Act; (vii) the Oil Pollution Act; and (viii) the Toxic Substances Control Act, as each of the foregoing has been amended and in effect on the Closing Date.

"**Executory Contract**" means any executory Contract to which the Seller is a Party which constitutes an Assigned Contract hereunder, including, but not limited to, Final Customer Purchase Orders.

"**Governmental Entity**" means any domestic or foreign government or political subdivision thereof, whether on a federal, state or local level and whether executive, legislative or judicial in nature, including any agency, authority, board, bureau, commission, court, department or other instrumentality thereof.

"**Hazardous Substance**" means any material or substance which is defined as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" or otherwise regulated under any Environmental Law or for which Liability can be imposed under any Environmental Law.

"**Indebtedness**" as applied to any Person, means without duplication: (i) all obligations of such Person for borrowed money or in respect of loans or advances; (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments; (iii) all obligations in respect of letters of credit, whether or not drawn, and bankers' acceptances issued for the account of such Person; (iv) all capitalized lease Liabilities of such Person; (v) all obligations for the costs or purchase prices of any of the Acquired Assets; (vi) any debt-like obligation or financing-type arrangement in respect of the deferred purchase price of the Acquired Assets; and (vii) any accrued interest, prepayment premiums or penalties or other costs or expenses related to any of the foregoing.

29

"**Knowledge**," "to the knowledge," "known" or similar variations thereof shall mean, with respect to Seller, the knowledge of John Watson and the knowledge that Seller and John Watson could be expected to discover or otherwise become aware of in the course of conducting a reasonable investigation concerning the existence of the matters addressed.

"**Liability**" or "**Liabilities,**" as used in this Agreement, with respect to any Person or any property of such Person, includes any debt, liability, duty, responsibility, commitment, requirement to perform, or obligation of any such Person or any claim, expense, loss, damage or penalty as against such Person or for which such Person may have (or is alleged to have) liability, in each case of any kind or nature, whether or not due, known or unknown, fixed, accrued, unaccrued, or contingent, including Indebtedness.

"**Person**" means an individual, a corporation, a limited liability company, a partnership, a joint venture, a business association, a trust or any other entity or organization, including a Governmental Entity.

"**Release**" means any past or present spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of a Hazardous Substance into the environment.

"**Representative**" when used with respect to any Person means any directors, officers, employees, stockholders, agents or representatives (including attorneys, accountants, consultants, banks and financial advisors) of such Person.

"**Seller Material Adverse Effect**" means any material adverse effect: (i) on the condition (financial or otherwise), Liabilities, properties, assets, or results of operations or prospects of the Business, taken as a whole; or (ii) on the ability of Seller to perform its obligations under or to consummate the transactions contemplated by this Agreement; provided, however, that the following shall not be considered in determining whether a Seller Material Adverse Effect has occurred: (A) any effect resulting from a change (1) in the economy, or financial, banking, currency or capital markets, in general (including, without limitation, changes in interest or exchange rates or commodities prices), or (2) the industry in which the Business operates, provided that any such affect does not disproportionately affect the Business as compared to other businesses in the industry; (B) any effect resulting from the announcement of this Agreement or the consummation of any of the transactions contemplated hereby; (C) any effect resulting from (1) any act of war, sabotage or terrorism, or any escalation or worsening of any such acts of war, sabotage or terrorism threatened or underway as of the date of this Agreement, or (2) hurricanes, tornados or other natural disasters; (D) any effect resulting from the taking of actions by Seller required by the terms of this Agreement; (E) the effect of any changes in applicable laws or accounting principles or standards; and (F) any failure to meet revenue or earnings projections (provided that any change or development causing any such failure to meet projections may be taken into account in determining whether a Seller Material Adverse Effect has occurred).

"**Taxes**" shall mean all federal, state, local and foreign taxes or similar charges, including all income, franchise, margin, real property, withholding, employment, sales, excise and transfer taxes and any interest and penalties thereon.

"**Third Party**" means any Person other than any Party to this Agreement and any such Party's officers, directors and Affiliates (as applicable).

(b)      The definitions in this Agreement shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not any particular provision of this Agreement.  The term "or" is not exclusive.

8.14    No Third Party Beneficiaries.  This Agreement is not intended to confer upon any Person other than the Parties hereto and their respective permitted successors and assigns any rights or remedies hereunder.

**[SIGNATURE PAGE FOLLOWS]**

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

31

IN WITNESS WHEREOF, the Parties to this Agreement have each caused this Agreement to be duly executed by their duly authorized officers as of the day and year first above written.

BUYER:

Mogas Industries, Inc.
By: _____ _Matt Mogas_ _____
Name:   Matt Mogas
Title:   President and CEO

SELLER:
Robert Ogle, Chapter 11 Trustee for Watson Valve Services, Inc.
By: _____ _Robert E. Ogle_ _____
Name:   ROBERT E OGLE
Title:   TRUSTEE

4826-8234-7709.11

EXECUTION VERSION

**Schedule 1.1(a)(i)**
Inventory

| INVENTORY |
|---|
| All valve components located at 4512 Steffani Ln., Houston, Texas 77041, the storage building adjacent to 4512 Steffani Ln., Houston Texas 77041, 5008 Steffani Ln., Houston Texas 77041 and 2910 McKinney, Houston, Texas. |

4843-2667-2832.7

**Schedule 1.1(a)(ii)**
**Customer-Owned Property**

## OPEN CONTRACTS AND PURCHASE ORDERS INCURED BEFORE THE JANUARY 24 EXPLOSION

| Customer Name | Work Order Number | Part # | Description | Sales ($) | Work in Process ($) |
|---|---|---|---|---|---|
| | 003709-002 | SKF1378A-R | 12-300 TI REPAIR | .00 | 6,252.64 |
| | 101119 | WV33RMMGG06-30 | DISASSEMBLY ROUTER - STANDARD | .00 | .00 |
| | 101121 | WV33RMCGG06-11 | DISASSEMBLY ROUTER - STANDARD | .00 | .00 |
| | 101296 | 010-0010-015    A | BODY-ASY 17.00X18-300 316H | 86,910.00 | 8,610.00 |
| | 101309 | WV020308QGG | 2-300 SEAT GASKET .030 | .00 | .00 |
| | 101310 | DIS01 | BUTTERFLY VALVE | .00 | 1,775.85 |
| | 101312 | WV020307XTG | | .00 | 14.97 |
| | 101316 | G5024-SR3-R | ACTUATOR DIS & EVAL | .00 | .00 |
| | WV2019-000 | | WATSON VALVE QFR | .00 | .00 |
| BARRICK GOLD | 003614-001 | WV63RFCGG06-00 | 6-300 WV ASSY F255 CrO ACT | 40,855.00 | 8,447.55 |
| BARRICK GOLD | 003623-001 | SKF1258A-R | 8-150 DC ASY 316 CrC | 12,075.01 | 840.31 |
| BARRICK GOLD | 003624-001 | SKF1258A-R | 8-150 DC ASY 316 CrC | 12,075.01 | 16,358.48 |
| BARRICK GOLD | 003647-001 | SKF1182A-R    A | 1-300 DC ASY CD4 CrO LEVER O2 | 4,886.01 | 8,607.41 |
| BARRICK GOLD | 003683-001 | WV23RFCGG01-01R  A | 2-300 WV ASY HDL F255 CrO O2 | 4,365.01 | 1,444.79 |
| BARRICK GOLD | 003690-002 | WV63RFCGG06-00 | 6-300 WV ASSY F255 CrO ACT | 49,090.00 | 875.67 |
| BARRICK GOLD | 003692-001 | WV63RFCGG06-00R | 6-300 WV ASSY F255 CrO ACT | 10,575.01 | 3,899.46 |
| BARRICK GOLD | 003692-002 | WV63RFCGG06-00 | 6-300 WV ASSY F255 CrO ACT | 49,090.00 | .00 |
| BARRICK GOLD | 003701-001 | SKF1180A-R    A | 6-300 DC ASY CD4 CrO GEAR OP | 10,575.00 | 787.35 |
| BARRICK GOLD | 003723-001 | WV23RFCGG06-01 | 2-300 WV ASSY F255 CrO BS O2 | 42,330.56 | .00 |
| BARRICK GOLD | 003733-001 | WV63RFCGG06-00 | 6-300 WV ASSY F255 CrO ACT | 24,437.00 | .00 |
| BARRICK GOLD | 003809-001 | SKF1180A-R    A | 6-300 DC ASY CD4 CrO GEAR OP | 14,825.00 | .00 |
| NEWMONT MINI | 003488-001 | SKF1390A-R    A | 2-300 DC ASY CD4 CrO HDL O2 | 4,056.54 | 116.30 |
| NEWMONT MINI | 003702-001 | SKF1390A-R    A | 2-300 DC ASY CD4 CrO HDL O2 | 3,576.01 | 219.51 |

2

4843-2667-2832.7

| Customer Name | Work Order Number | Part # | Description | Sales ($) | Work in Process ($) |
|---|---|---|---|---|---|
| | | | OPEN CONTRACTS AND PURCHASE ORDERS INCURED BEFORE THE JANUARY 24 EXPLOSION | | |
| NEWMMONT MINI | 003702-002 | SKF1384A-SPECR   A | 8-300 DC ASSY CD4 CrO ACT | 13,796.01 | 1,302.76 |
| NEWMMONT MINI | 003831-001 | WV53RUCGG01-01R | .5-300 WV Ti12 CrO HDL O2 SV | 2,552.00 | .00 |
| NEWMMONT MINI | 003831-002 | WV53RUCGG01-01R | .5-300 WV Ti12 CrO HDL O2 SV | 2,552.00 | .00 |
| NEWMMONT MINI | 003831-003 | WV53RUCGG01-01R | .5-300 WV Ti12 CrO HDL O2 SV | 3,554.00 | .00 |
| NEWMMONT MINI | 003833-001 | WV13RFCGG01-01R | 1-300 WV ASY F255 CrO HDL O2 | 4,887.00 | .00 |
| CHEVRON PHIL | 003643-001 | CV33RWPVV00-12R | 3X6X3 IVC VALVE MOD | 3,500.01 | 773.01 |
| CHEVRON PHIL | 003707-001 | CV33RWPVV00-12R | LABOR - 3X6X3 IVC VALVE | 3,500.01 | 982.51 |
| CHEVRON PHIL | 003708-001 | CV33RWPVV00-12R | LABOR - 3X6X3 IVC VALVE | 3,500.01 | 1,107.79 |
| CHEVRON PHIL | 003714-001 | CV33RWPVV00-12R | LABOR - 3X6X3 IVC VALVE | 3,500.01 | 2,607.13 |
| FREEPORT MCM | 003728-001 | WV66RUCGG06-00R | 6-600 WV ASY Ti12 CrO BS | 12,753.01 | 451.39 |
| FREEPORT MCM | 003738-001 | VV0055-R       A | 2-600 VV ASY Ti12 CrO BS | 5,320.01 | 49.54 |
| FREEPORT MCM | 003738-002 | VV0055-R       A | 2-600 VV ASY Ti12 CrO BS | 5,320.01 | 44.22 |
| MONSANTO-LUL | 003245-010 | WV33RMMGG06-00 | WV 3-300 Mon Act Mtg | .00 | 757.33 |
| MONSANTO-LUL | 003641-001 | MS33RQCGG06-23R  A | 3-300 MS ASY M400 K500 CrO | 6,412.01 | 8,345.34 |
| MONSANTO-LUL | 003652-001 | WV1442-0C09-R | 3-300 WV ASYC276 CrO BS SP | 6,412.01 | 2,159.01 |
| MONSANTO-LUL | 003659-001 | MS33RRCGG06-23R  A | 3-300 MS FBV M400 C276 CrO-H | 3,900.00 | 134.27 |
| MONSANTO-LUL | 003660-001 | MS33RRCGG06-23R  A | 3-300 MS FBV M400 C276 CrO-H | 3,900.00 | 382.55 |
| MONSANTO-LUL | 003661-001 | MS33RCGG06-23R   A | 3-300 MS FBV M400 C276 CrO-H | 3,900.00 | 21.30 |

| Customer Name | Work Order Number | Part # | Description | Sales ($) | Work in Process ($) |
|---|---|---|---|---|---|
| | | | OPEN CONTRACTS AND PURCHASE ORDERS INCURED BEFORE THE JANUARY 24 EXPLOSION | | |
| MONSANTO-LUL | 003662-001 | MS33RRCGG06-23R A | 3-300 MS FBV M400 C276 CrO-H | 3,900.00 | 7,060.80 |
| MONSANTO-LUL | 003663-001 | MS33RRCGG06-23R A | 3-300 MS FBV M400 C276 CrO-H | 3,900.00 | .00 |
| MONSANTO-LUL | 003699-001 | MS33RRCGG06-23R A | 3-300 MS FBV M400 C276 CrO-H | 3,900.00 | 151.33 |
| MONSANTO-LUL | 003715-001 | MS33RRCGG06-23R A | 3-300 MS FBV M400 C276 CrO-H | 3,900.00 | 1,191.91 |
| MONSANTO-LUL | 003716-001 | MS33RRCGG06-23R A | 3-300 MS FBV M400 C276 CrO-H | 3,900.00 | 1,191.91 |
| MONSANTO-LUL | 003729-001 | MS33RRCGG06-23R A | 3-300 MS FBV M400 C276 CrO-H | 6,412.01 | 855.19 |
| MONSANTO-LUL | 003730-001 | MS33RRCGG06-23R A | 3-300 MS FBV M400 C276 CrO-H | 6,412.01 | 454.30 |
| MONSANTO-LUL | 003732-001 | MS33RRCGG06-23R A | 3-300 MS FBV M400 C276 CrO-H | 6,412.01 | 251.93 |
| MONSANTO-LUL | 101300 | MS33RRCGG06-23R A | 3-300 MS FBV M400 C276 CrO-H | .00 | 8,608.03 |
| MONSANTO-LUL | 364201-000 | WV1442-5M09-R | 3-300 WV ASY M400 C276 CrO | 6,412.01 | 3,615.68 |
| MONSANTO-LUL | R03695-001 | MS33RRCGG06-23R A | 3-300 MS FBV M400 C276 CrO-H | 6,412.01 | .00 |
| MONSANTO-LUL | R03696-001 | MS33RRCGG06-23R A | 3-300 MS FBV M400 C276 CrO-H | 6,412.01 | .00 |
| MONSANTO-LUL | R03697-001 | MS33RRCGG06-23R A | 3-300 MS FBV M400 C276 CrO-H | 6,412.01 | .00 |
| MONSANTO-LUL | R03698-001 | MS33RRCGG06-23R A | 3-300 MS FBV M400 C276 CrO-H | 6,412.01 | .00 |
| AIV, L.P. | 003617-001 | K256R9WGG01-00 | .5-600 KITZ ASY 410 CrO HDL | 19,260.00 | 21,733.06 |
| AIV, L.P. | 003618-001 | K256R9WGG01-00 | .5-600 KITZ ASY 410 CrO HDL | 12,840.00 | 14,428.49 |
| AIV, L.P. | 101304 | SP0308-06 | GLAND .5-600 KITZ 316 | .00 | 499.58 |
| AIV, L.P. | 101305 | SP0310-01 | BODY EXT .5-600 KITZ A105 | .00 | 229.10 |

| OPEN CONTRACTS AND PURCHASE ORDERS INCURED BEFORE THE JANUARY 24 EXPLOSION | | | | | |
| Customer Name | Work Order Number | Part # | Description | Sales ($) | Work in Process ($) |
|---|---|---|---|---|---|
| WATSON VALVE | 002850-002 | WV26RWWGG01-00 | 2-600 CS Watson Cr/C Handle | .00 | 729.95 |
| BARRICK - PU | 003678-002 | SK0117    A | 1.5-1500 WV ASY 2205 CrO O2 | 20,593.35 | 3,168.88 |
| BARRICK - PU | 003678-003 | SK0117    A | 1.5-1500 WV ASY 2205 CrO O2 | 20,593.35 | 3,438.22 |
| BARRICK - PU | 003705-001 | MVA6RUMGG06-90R | 10-600 MV ASY Ti12 CrO ACT REP | 35,439.70 | 1,648.55 |
| VALVESCOM (B | 003694-001 | WV73RHCGG06-03 | .75-300 WV ASY 2507 CrO BS FRX | 13,461.50 | 689.58 |
| VALVESCOM (B | 003694-002 | WV23RHCGG06-03 | 2-300 WV ASY 2507 CrO BS FRX | 39,060.20 | 7,138.65 |
| VALVESCOM (B | 003694-003 | WV23RUCCGG01-02   A | 2-300 WV Ti12 CrO MBC2 HDL O2 | 20,820.20 | 4,731.76 |
| LIHIR GOLD L | 003703-001 | SK0505 | 1-300 2507 WV SK0505 BA-34 O2 | 18,531.24 | 1,700.55 |
| LIHIR GOLD L | 003717-001 | SK0484 | .5-300 WV ASY 2507 CrO HDL O2 | 22,887.00 | .00 |
| LIHIR GOLD L | 003717-002 | SK0505 | 1-300 2507 WV SK0505 BA-34 O2 | 27,796.86 | .00 |
| LIHIR GOLD L | 003718-001 | SK0503    A | .75-300 WV ASY 2507 CrO LVR O2 | 54,757.02 | 2,785.08 |
| LIHIR GOLD L | 003750-001 | WV23RHCGG06-00R | 2-300 WV ASY 2507 CrO BS | .00 | .00 |
| LIHIR GOLD L | 003751-001 | WV23RHCGG06-00R | 2-300 WV ASY 2507 CrO BS | .00 | .00 |
| WATSON VALVE | 003644-026 | WVYURKCGG06-27 | DN150 PN40 WV 2507 A20 CrO O2 | 39,116.78 | 15,304.20 |
| WATSON VALVE | 003644-027 | WVYURHCGG06-27 | DN150-PN40 WV ASY 2507 CrO O2 | 41,100.00 | 8,021.20 |
| WATSON VALVE | 101289 | MV83RFCGG06-00 |  | .00 | .00 |
| LIHIR GOLD L | 101317 | MV0803159OG-02 | B&S SET 8-300 MV 2507 CrO SC | .00 | 286.65 |
| PT. HUAYUE N | 003489-001 | W10C06-001001AD   A | W1 .75X0.75-600RF Ti12 TiO | 29,344.00 | 1,640.00 |
| PT. HUAYUE N | 003489-002 | W10C09-001001AD   A | W1 .75X0.75-900RF Ti12 TiO | 61,808.00 | .00 |
| PT. HUAYUE N | 003489-003 | W10203-001001AD   C | W1 2.00X2-300RF Ti12 TiO | 125,496.00 | 38,947.14 |
| PT. HUAYUE N | 003489-004 | W10203-001001AD   C | W1 2.00X2-300RF Ti12 TiO | 216,144.00 | 47,283.55 |
| PT. HUAYUE N | 003489-005 | W10206-001001AD   B | W1 2.00X2-600RF Ti12 TiO BS | 178,496.00 | 54,701.03 |
| PT. HUAYUE N | 003489-006 | W10206-001001AD   B | W1 2.00X2-600RF Ti12 TiO BS | 568,760.00 | 194,813.67 |
| PT. HUAYUE N | 003489-007 | W10206-001001AD   B | W1 2.00X2-600RF Ti12 TiO BS | 85,314.00 | 28,082.29 |

5

4843-2667-2832.7

## OPEN CONTRACTS AND PURCHASE ORDERS INCURED BEFORE THE JANUARY 24 EXPLOSION

| Customer Name | Work Order Number | Part # | Description | Sales ($) | Work in Process ($) |
|---|---|---|---|---|---|
| PT. HUAYUE N | 003489-008 | W10606-001001AD_A | W1 6.00X6-600RF Ti12 TiO BS | 547,424.00 | .00 |
| PT. HUAYUE N | 003489-009 | W21003-001001AD_A | W2 10.00X10-300RF Ti12 TiO BS | 1,649,072.00 | 3,200.00 |
| PT. HUAYUE N | 003489-010 | W21403-001001AD_B | W2 13.25X14-600RF Ti12 TiO BS | 681,168.00 | 400.00 |
| PT. HUAYUE N | 101188 | W10203-001001AD_A | W1 2.00X2-300RF Ti12 TiO | .00 | 7,065.11 |
| PT. HUAYUE N | 101307 | 010-0001-024AF_C | BODY-ASY 2.00X2-300RF W1 Ti12 | .00 | 73,755.86 |
| PT. HUAYUE N | 101308 | 010-0007-024AF_B | BODY-ASY 2.00X2-600RF W1 Ti12 | .00 | 86,480.01 |
| MINERA PEÑAS | 003600-001 | W21803-001005_A | W2 17.00X18-300RF 316H CrC | 427,982.00 | .00 |
| MINERA PEÑAS | 003600-002 | W21803-001005_A | W2 17.00X18-300RF 316H CrC | 150,015.00 | .00 |

## OPEN CONTRACTS AND PURCHASE ORDERS INCURRED AFTER THE JANUARY 24 EXPLOSION

| Customer | Purchase Order Number | Part Number | Description | Sales Order | Order Total ($) |
|---|---|---|---|---|---|
| BARRICK GOLDSTRIKE MINES, INC. | 1236250 | WV33RFCGG01-00R | 3-300 WV ASY F255 CrO HDL | 0003785 | 6,000.01 |
| BARRICK GOLDSTRIKE MINES, INC. | 1236251 | WV33RFCGG01-00R | 3-300 WV ASY F255 CrO HDL | 0003786 | 6,000.01 |
| BARRICK GOLDSTRIKE MINES, INC. | 1236252 | WV33RFCGG01-00R | 3-300 WV ASY F255 CrO HDL | 0003787 | 6,000.01 |
| BARRICK GOLDSTRIKE MINES, INC. | 1236141 | WV63RFCGG06-00R | 6-300 WV ASSY F255 CrO ACT | 0003788 | 10,000.01 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778942/R | WV63RFCGG06-00R | 6-300 WV ASSY F255 CrO ACT | 0003789 | 18,256.00 |

6

4843-2667-2832.7

| | | OPEN CONTRACTS AND PURCHASE ORDERS INCURRED AFTER THE JANUARY 24 EXPLOSION | | | |
| Customer | Purchase Order Number | Part Number | Description | Sales Order | Order Total ($) |
| --- | --- | --- | --- | --- | --- |
| BARRICK GOLDSTRIKE MINES, INC. | 2778943/R | WV63RFCGG06-00R | 6-300 WV ASSY F255 CrO ACT | 0003790 | 18,176.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778938/R | SKF1182A-R      A | 1-300 DC ASY CD4 CrO LEVER O2 | 0003795 | 3,246.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778937/R | SKF1182A-R      A | 1-300 DC ASY CD4 CrO LEVER O2 | 0003796 | 3,246.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778936/R | NV53RFCGG00-01R | .5-300 NV ASY F255 CrO BS O2 | 0003797 | 3,246.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778935/R | NV53RFCGG00-01R | .5-300 NV ASY F255 CrO BS O2 | 0003798 | 3,246.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 1235919 | WV23RFCGG01-01R   A | 2-300 WV ASY HDL F255 CrO O2 | 0003799 | 7,000.01 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778926/R | WV23RFCGG01-01R   A | 2-300 WV ASY HDL F255 CrO O2 | 0003800 | 5,962.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778927/R | WV23RFCGG01-01R   A | 2-300 WV ASY HDL F255 CrO O2 | 0003801 | 5,962.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778933/R | WV23RFCGG01-01R   A | 2-300 WV ASY HDL F255 CrO O2 | 0003802 | 5,823.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778932/R | WV23RFCGG01-01R   A | 2-300 WV ASY HDL F255 CrO O2 | 0003803 | 5,963.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778931/R | WV23RFCGG01-01R   A | 2-300 WV ASY HDL F255 CrO O2 | 0003804 | 6,563.00 |

7

4843-2667-2832.7

| | | | OPEN CONTRACTS AND PURCHASE ORDERS INCURRED AFTER THE JANUARY 24 EXPLOSION | | | |
|---|---|---|---|---|---|---|
| Customer | Purchase Order Number | Part Number | Description | Sales Order | Order Total ($) |
| BARRICK GOLDSTRIKE MINES, INC. | 2778930/R | WV23RFCGG01-01R  A | 2-300 WVV ASY HDL F255 CrO O2 | 0003805 | 6,563.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778934/R | WV23RFCGG01-01R  A | 2-300 WVV ASY HDL F255 CrO O2 | 0003806 | 5,963.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 1236149 | SKF1258A-R | 8-150 DC ASY 316 CrC | 0003811 | 13,000.01 |
| BARRICK GOLDSTRIKE MINES, INC. | 1235933 | SKF1166A-R | 10-300 DC ASY Ti3 CrO ACT | 0003813 | 17,000.01 |
| BARRICK GOLDSTRIKE MINES, INC. | 2779977/S | WG0331-0K09 | AGITATOR ASSY 8X8 Ti12 CrO | 0003828 | 161,500.00 |
| NEWMONT MINING CORP | 3002154876 | WV23RFCGG01-01R  A | 2-300 WVV ASY HDL F255 CrO O2 | 0003754 | 2,974.02 |
| NEWMONT MINING CORP | 3002155572 | WV13RFCGG01-01R | 1-300 WVV ASY F255 CrO HDL O2 | 0003815 | 3,380.01 |
| WATSON VALVE SERVICES-AUSTR | 002226 | WV05031590K | .5-300 B&S SET WV Ti12 CrO-H | 0003814 | 10,820.00 |
| WATSON VALVE SERVICES-AUSTR | 002263 | WV03031590G | 3-300 B&S SET WV 2507 CrO | 0003816 | 4,344.00 |
| WATSON VALVE SERVICES-AUSTR | 002208 | MV08031590G | B&S SET 8-300 MV 2507 CrO | 0003817 | 83,084.40 |

8

**Schedule 1.1(b)**
**Customer Prepayments and Covered Receivables**

| Customer Name | Customer No. | SM | Telephone | Receivable Balance | Current Amount | 30-60 Days | 60-60 Days | Over 90 Days |
|---|---|---|---|---|---|---|---|---|
| | | | | WATSON VALVE SERVICES – ACCOUNTS RECEIVABLE | | | | |
| AIV, L.P. | 600037 | RB | 713-462-4181 | 7,687.00 | | | | 7,687.00 |
| ASAP MACHINE, INC | 600190 | RB | | 2,706.96 | | | | 2,706.96 |
| BARRICK - PUEBLO VIEJO (OBO) | 600053 | RB | | 75,368.00 | | 75,368.00 | | |
| BARRICK GOLDSTRIKE MINES, INC. | 002643 | RB | 775-778-8295 | 95,156.96 | 57,700.46 | | | 37,456.50 |
| FREEPORT MCMORAN COPPER & GOLD | 009843 | RB | 928-633-3233 | 19,405.78 | 19,405.78 | | | |
| LENZING FIBERS | 600040 | RB | 251-679-2661 | 1,200.00 | | | | 1,200.00 |
| LIHIR GOLD LTD | 600126 | BW | | 71,629.15 | | | 71,629.15 | |
| NEWMONT MINING CORP | 008745 | RB | 775-778-4759 | 22,525.00 | 17,119.00 | 5,406.00 | | |
| TECH/PRO HEAVY INDUSTRIAL INC. | 600192 | | 514-633-1231 | 45,933.34 | 45,933.34 | | | |
| WATSON VALVE SERVICES-AUSTR | WATSON VALVE SERVICES-AUSTR | BW | 61 (4) 1971 7181 (Australia) | 33,732.00 | 33,732.00 | | | |
| **GRAND TOTAL** | | | | 375,344.19 | 173,890.58 | 80,774.00 | 71,629.15 | 49,050.46 |

9

4843-2667-2832.7

## Schedule 1.1(e)
## Equipment/Machines/Office Furniture

| Item # | Description of Equipment | Model or ID # | Acquisition Cost ($) | Mgt Est of Current Market Value ($) |
|---|---|---|---|---|
| | **Equipment/Machines/Office Furniture** | | | |
| 45k down payment (50% of the purchase price of this piece of equipment is still owed) | Test Stand - New | | 90,720.00 | 90,720.00 |
| | Cincinnati Python Lathe | CM0065 | 25,950.00 | 19,462.50 |
| | Used Blast Cabinet | | 11,570.00 | 8,677.50 |
| | Abrasive Blast Cabinet | | 50,685.00 | 38,013.75 |
| | Ratchet Wrenches & Attachments | | 16,619.00 | 12,464.25 |
| | Colchester Lathe | | 10,553.00 | 7,914.75 |
| | Hydraulic Press | | 7,421.00 | 5,565.75 |
| | 2013 F450 | | 27,500.00 | 20,625.00 |
| | P500 Marking Machine | | 7,290.00 | 5,467.50 |
| | SIC Marking Machine | | 8,581.00 | 6,435.75 |
| | Monarch Lathe | | 3,002.00 | 2,251.50 |
| | Portable  Hydraulic PU | | 10,561.00 | 7,920.75 |
| | Air Compressor | | 5,780.00 | 4,335.00 |
| | | TOTAL: | 276,232.00 | |

10

4843-2667-2832.7

**Schedule 1.1(f)**

**Intellectual Property – All of Seller's Right, Title, and Interest In and To the Following:**

| Watson Valve Intellectual Property |
|---|
| All Drawings & Designs |
| Technical Information |
| All Valve Support Calculations |
| Trade Names |
| Domain Names and Related Passwords and Account Numbers |
| Slogans |
| Logos |
| Social Media Assets |
| E-Commerce Assets including all rights to the Debtor's website, http://watsonvalve.com/ |
| All Data in Global Shop Solutions |
| All Drawings & Designs produced with Autodesk |
| All Drawings or other products produced with SOLIDWORKS |

11

4843-2667-2832.7

**Schedule 1.1(g)**
**Licenses, Permits, and Authorizations**

(None)

12

**Schedule 1.1(h)**
Assigned Contracts

| | | | OPEN CONTRACTS AND PURCHASE ORDERS INCURED BEFORE THE JANUARY 24 EXPLOSION | | | |
|---|---|---|---|---|---|---|
| Customer Name | Work Order Number | Part # | Description | Sales ($) | Work in Process ($) | Cure Amount ($) |
| | 003709-002 | SKF1378A-R | 12-300 Ti REPAIR | .00 | 6,252.64 | 0.00 |
| | 101119 | WV33RMMGG06-30 | DISASSEMBLY ROUTER - STANDARD | .00 | .00 | 0.00 |
| | 101121 | WV33RMCGG06-11 | DISASSEMBLY ROUTER - STANDARD | .00 | .00 | 0.00 |
| | 101296 | 010-0010-015   A | BODY-ASY 17.00X18-300 316H | 86,910.00 | 8,610.00 | 0.00 |
| | 101309 | WV020308OGG | 2-300 SEAT GASKET .030 | .00 | .00 | 0.00 |
| | 101310 | DIS01 | BUTTERFLY VALVE | .00 | 1,775.85 | 0.00 |
| | 101312 | WV020307XTG | | .00 | 14.97 | 0.00 |
| | 101316 | G5024-SR3-R | ACTUATOR DIS & EVAL | .00 | .00 | 0.00 |
| | WV2019-000 | | WATSON VALVE QFR | .00 | .00 | 0.00 |
| BARRICK GOLD | 003614-001 | WV63RFCGG06-00 | 6-300 WV ASSY F255 CrO ACT | 40,855.00 | 8,447.55 | 0.00 |
| BARRICK GOLD | 003623-001 | SKF1258A-R | 8-150 DC ASY 316 CrC | 12,075.01 | 840.31 | 0.00 |
| BARRICK GOLD | 003624-001 | SKF1258A-R | 8-150 DC ASY 316 CrC | 12,075.01 | 16,358.48 | 0.00 |
| BARRICK GOLD | 003647-001 | SKF1182A-R    A | 1-300 DC ASY CD4 CrO LEVER O2 | 4,886.01 | 8,607.41 | 0.00 |
| BARRICK GOLD | 003683-001 | WV23RFCGG01-01R A | 2-300 WV ASY HDL F255 CrO O2 | 4,365.01 | 1,444.79 | 0.00 |
| BARRICK GOLD | 003690-002 | WV63RFCGG06-00 | 6-300 WV ASSY F255 CrO ACT | 49,090.00 | 875.67 | 0.00 |
| BARRICK GOLD | 003692-001 | WV63RFCGG06-00R | 6-300 WV ASSY F255 CrO ACT | 10,575.01 | 3,899.46 | 0.00 |
| BARRICK GOLD | 003692-002 | WV63RFCGG06-00 | 6-300 WV ASSY F255 CrO ACT | 49,090.00 | .00 | 0.00 |
| BARRICK GOLD | 003701-001 | SKF1180A-R    A | 6-300 DC ASY CD4 CrO GEAR OP | 10,575.00 | 787.35 | 0.00 |

13

| | | | OPEN CONTRACTS AND PURCHASE ORDERS INCURED BEFORE THE JANUARY 24 EXPLOSION | | | |
|---|---|---|---|---|---|---|
| Customer Name | Work Order Number | Part # | Description | Sales ($) | Work in Process ($) | Cure Amount ($) |
| BARRICK GOLD | 003723-001 | WV23RFCGG06-01 | 2-300 WV ASSY F255 CrO BS O2 | 42,330.56 | .00 | 0.00 |
| BARRICK GOLD | 003733-001 | WV63RFCGG06-00 | 6-300 WV ASSY F255 CrO ACT | 24,437.00 | .00 | 0.00 |
| BARRICK GOLD | 003809-001     A | SKF1180A-R     A | 6-300 DC ASY CD4 CrO GEAR OP | 14,825.00 | .00 | 0.00 |
| NEWMONT MINI | 003488-001 | SKF1390A-R     A | 2-300 DC ASY CD4 CrO HDL O2 | 4,056.54 | 116.30 | 0.00 |
| NEWMONT MINI | 003702-001 | SKF1390A-R     A | 2-300 DC ASY CD4 CrO HDL O2 | 3,576.01 | 219.51 | 0.00 |
| NEWMONT MINI | 003702-002 | SKF1384A-SPECR  A | 8-300 DC ASSY CD4 CrO ACT | 13,796.01 | 1,302.76 | 0.00 |
| NEWMONT MINI | 003831-001 | WV53RUCGG01-01R | .5-300 WV Ti12 CrO HDL O2 SV | 2,552.00 | .00 | 0.00 |
| NEWMONT MINI | 003831-002 | WV53RUCGG01-01R | .5-300 WV Ti12 CrO HDL O2 SV | 2,552.00 | .00 | 0.00 |
| NEWMONT MINI | 003831-003 | WV53RUCGG01-01R | .5-300 WV Ti12 CrO HDL O2 SV | 3,554.00 | .00 | 0.00 |
| NEWMONT MINI | 003833-001 | WV13RFCGG01-01R | 1-300 WV ASY F255 CrO HDL O2 | 48,87.00 | .00 | 0.00 |
| CHEVRON PHIL | 003643-001 | CV33RWPVV00-12R | 3X6X3 IVC VALVE MOD | 3,500.01 | 773.01 | 0.00 |
| CHEVRON PHIL | 003707-001 | CV33RWPVV00-12R | LABOR - 3X6X3 IVC VALVE | 3,500.01 | 982.51 | 0.00 |
| CHEVRON PHIL | 003708-001 | CV33RWPVV00-12R | LABOR - 3X6X3 IVC VALVE | 3,500.01 | 1,107.79 | 0.00 |
| CHEVRON PHIL | 003714-001 | CV33RWPVV00-12R | LABOR - 3X6X3 IVC VALVE | 3,500.01 | 2,607.13 | 0.00 |
| FREEPORT MCM | 003728-001 | WV66RUCGG06-00R | 6-600 WV ASY Ti12 CrO BS | 12,753.01 | 451.39 | 0.00 |
| FREEPORT MCM | 003738-001 | VV0055-R      A | 2-600 VV ASY Ti12 CrO BS | 5,320.01 | 49.54 | 0.00 |

14

4843-2667-2832.7

OPEN CONTRACTS AND PURCHASE ORDERS INCURED BEFORE THE JANUARY 24 EXPLOSION

| Customer Name | Work Order Number | Part # | Description | Sales ($) | Work in Process ($) | Cure Amount ($) |
|---|---|---|---|---|---|---|
| FREEPORT MCM | 003738-002 | VV0055-R      A | 2-600 VV ASY Ti12 CrO BS | 5,320.01 | 44.22 | 0.00 |
| MONSANTO-LUL | 003245-010 | WV33RMMGG06-00 | WV 3-300 Mon Act Mtg | .00 | 757.33 | 0.00 |
| MONSANTO-LUL | 003641-001 | MS33RQCGG06-23R  A | 3-300 MS ASY M400 K500 CrO | 6,412.01 | 8,345.34 | 0.00 |
| MONSANTO-LUL | 003652-001 | WV1442-0C09-R | 3-300 WV ASYC276 CrO BS SP | 6,412.01 | 2,159.01 | 0.00 |
| MONSANTO-LUL | 003659-001 | MS33RRCGG06-23R  A | 3-300 MS FBV M400 C276 CrO-H | 3,900.00 | 134.27 | 0.00 |
| MONSANTO-LUL | 003660-001 | MS33RRGGG06-23R  A | 3-300 MS FBV M400 C276 CrO-H | 3,900.00 | 382.55 | 0.00 |
| MONSANTO-LUL | 003661-001 | MS33RRCGG06-23R  A | 3-300 MS FBV M400 C276 CrO-H | 3,900.00 | 21.30 | 0.00 |
| MONSANTO-LUL | 003662-001 | MS33RRCGG06-23R  A | 3-300 MS FBV M400 C276 CrO-H | 3,900.00 | 7060.80 | 0.00 |
| MONSANTO-LUL | 003663-001 | MS33RRCGG06-23R  A | 3-300 MS FBV M400 C276 CrO-H | 3,900.00 | .00 | 0.00 |
| MONSANTO-LUL | 003699-001 | MS33RRCGG06-23R  A | 3-300 MS FBV M400 C276 CrO-H | 3,900.00 | 151.33 | 0.00 |
| MONSANTO-LUL | 003715-001 | MS33RRCGG06-23R  A | 3-300 MS FBV M400 C276 CrO-H | 3,900.00 | 1,191.91 | 0.00 |
| MONSANTO-LUL | 003716-001 | MS33RRCGG06-23R  A | 3-300 MS FBV M400 C276 CrO-H | 3,900.00 | 1,191.91 | 0.00 |
| MONSANTO-LUL | 003729-001 | MS33RRCGG06-23R  A | 3-300 MS FBV M400 C276 CrO-H | 6,412.01 | 855.19 | 0.00 |
| MONSANTO-LUL | 003730-001 | MS33RRCGG06-23R  A | 3-300 MS FBV M400 C276 CrO-H | 6,412.01 | 454.30 | 0.00 |
| MONSANTO-LUL | 003732-001 | MS33RRCGG06-23R  A | 3-300 MS FBV M400 C276 CrO-H | 6,412.01 | 251.93 | 0.00 |
| MONSANTO-LUL | 101300 | MS33RRCGG06-23R  A | 3-300 MS FBV M400 C276 CrO-H | .00 | 8,608.03 | 0.00 |

15

4843-2667-2832.7

| | | | OPEN CONTRACTS AND PURCHASE ORDERS INCURED BEFORE THE JANUARY 24 EXPLOSION | | | |
|---|---|---|---|---|---|---|
| Customer Name | Work Order Number | Part # | Description | Sales ($) | Work in Process ($) | Cure Amount ($) |
| MONSANTO-LUL | 364201-000 | WV1442-5M09-R | 3-300 WV ASY M400 C276 CrO | 6,412.01 | 3,615.68 | 0.00 |
| MONSANTO-LUL | R03695-001 | MS33RRCGG06-23R  A | 3-300 MS FBV M400 C276 CrO-H | 6,412.01 | .00 | 0.00 |
| MONSANTO-LUL | R03696-001 | MS33RRCGG06-23R  A | 3-300 MS FBV M400 C276 CrO-H | 6,412.01 | .00 | 0.00 |
| MONSANTO-LUL | R03697-001 | MS33RRCGG06-23R  A | 3-300 MS FBV M400 C276 CrO-H | 6,412.01 | .00 | 0.00 |
| MONSANTO-LUL | R03698-001 | MS33RRCGG06-23R  A | 3-300 MS FBV M400 C276 CrO-H | 6,412.01 | .00 | 0.00 |
| AIV, L.P. | 003617-001 | KZ56R9WGG01-00 | .5-600 KITZ ASY 410 CrO HDL | 19,260.00 | 21,733.06 | 0.00 |
| AIV, L.P. | 003618-001 | KZ56R9WGG01-00 | .5-600 KITZ ASY 410 CrO HDL | 12,840.00 | 14,428.49 | 0.00 |
| AIV, L.P. | 101304 | SP0308-06 | GLAND .5-600 KITZ 316 | .00 | 499.58 | 0.00 |
| AIV, L.P. | 101305 | SP0310-01 | BODY EXT .5-600 KITZ A105 | .00 | 229.10 | 0.00 |
| WATSON VALVE | 002850-002 | WV26RWWGG01-00 | 2-600 CS Watson Cr/C Handle | .00 | 729.95 | 0.00 |
| BARRICK - PU | 003678-002 | SK0117        A | 1.5-1500 WV ASY 2205 CrO O2 | 20,593.35 | 3,168.88 | 0.00 |
| BARRICK - PU | 003678-003 | SK0117        A | 1.5-1500 WV ASY 2205 CrO O2 | 20,593.35 | 3,438.22 | 0.00 |
| BARRICK - PU | 003705-001 | MVA6RUMG06-90R | 10-600 MV ASY Ti12 CrO ACT REP | 35,439.70 | 1,648.55 | 0.00 |
| VALVESCOM B | 003694-001 | WV73RHCGG06-03 | .75-300 WV ASY 2507 CrO BS FRX | 13,461.50 | 689.58 | 0.00 |
| VALVESCOM B | 003694-002 | WV23RHCGG06-03 | 2-300 WV ASY 2507 CrO BS FRX | 39,060.20 | 7,138.65 | 0.00 |
| VALVESCOM B | 003694-003 | WV23RUCGG01-02  A | 2-300 WV Ti12 CrO MBC2 HDL O2 | 20,820.20 | 4,731.76 | 0.00 |
| LIHIR GOLD L | 003703-001 | SK0505 | 1-300 2507 WV SK0505 BA-34 O2 | 18,531.24 | 1,700.55 | 0.00 |
| LIHIR GOLD L | 003717-001 | SK0484 | .5-300 WV ASY 2507 CrO HDL O2 | 22,887.00 | .00 | 0.00 |
| LIHIR GOLD L | 003717-002 | SK0505 | 1-300 2507 WV SK0505 BA-34 O2 | 27,796.86 | .00 | 0.00 |
| LIHIR GOLD L | 003718-001 | SK0503        A | .75-300 WV ASY 2507 CrO LVR O2 | 54,757.02 | 2785.08 | 0.00 |

16

4843-2667-2832.7

| | | OPEN CONTRACTS AND PURCHASE ORDERS INCURED BEFORE THE JANUARY 24 EXPLOSION | | | | |
|---|---|---|---|---|---|---|
| Customer Name | Work Order Number | Part # | Description | Sales ($) | Work in Process ($) | Cure Amount ($) |
| LIHIR GOLD L | 003750-001 | WV23RHCGG06-00R | 2-300 WV ASY 2507 CrO BS | .00 | .00 | 0.00 |
| LIHIR GOLD L | 003751-001 | WV23RHCGG06-00R | 2-300 WV ASY 2507 CrO BS | .00 | .00 | 0.00 |
| WATSON VALVE | 003644-026 | WVYURKCGG06-27 | DN150 PN40 WV 2507 A20 CrO O2 | 39,116.78 | 15,304.20 | 0.00 |
| WATSON VALVE | 003644-027 | WVYURHCGG06-27 | DN150-PN40 WV ASY 2507 CrO O2 | 41,100.00 | 8,021.20 | 0.00 |
| WATSON VALVE | 101289 | MV83RFCGG06-00 | | .00 | .00 | 0.00 |
| LIHIR GOLD L | 101317 | MV08031590G-02 | B&S SET 8-300 MV 2507 CrO SC | .00 | 286.65 | 0.00 |
| PT. HUAYUE N | 003489-001 | W10C06-001001AD A | W1 .75X0.75-600RF Ti12 TiO | 29,344.00 | 1,640.00 | 0.00 |
| PT. HUAYUE N | 003489-002 | W10C09-001001AD A | W1 .75X0.75-900RF Ti12 TiO | 61,808.00 | .00 | 0.00 |
| PT. HUAYUE N | 003489-003 | W10203-001001AD C | W1 2.00X2-300RF Ti12 TiO | 125,496.00 | 38,947.14 | 0.00 |
| PT. HUAYUE N | 003489-004 | W10203-001001AD C | W1 2.00X2-300RF Ti12 TiO | 216,144.00 | 47,283.55 | 0.00 |
| PT. HUAYUE N | 003489-005 | W10206-001001AD B | W1 2.00X2-600RF Ti12 TiO BS | 178,496.00 | 54,701.03 | 0.00 |
| PT. HUAYUE N | 003489-006 | W10206-001001AD B | W1 2.00X2-600RF Ti12 TiO BS | 568,760.00 | 194,813.67 | 0.00 |
| PT. HUAYUE N | 003489-007 | W10206-001001AD B | W1 2.00X2-600RF Ti12 TiO BS | 85,314.00 | 28,082.29 | 0.00 |
| PT. HUAYUE N | 003489-008 | W10606-001001AD A | W1 6.00X6-600RF Ti12 TiO BS | 547,424.00 | .00 | 0.00 |
| PT. HUAYUE N | 003489-009 | W21003-001001AD A | W2 10.00X10-300RF Ti12 TiO BS | 1,649,072.00 | 3,200.00 | 0.00 |
| PT. HUAYUE N | 003489-010 | W21403-001001AD B | W2 13.25X14-600RF Ti12 TiO BS | 681,168.00 | 400.00 | 0.00 |
| PT. HUAYUE N | 101188 | W10203-001001AD A | W1 2.00X2-300RF Ti12 TiO | .00 | 7,065.11 | 0.00 |

17

4843-2667-2832.7

| OPEN CONTRACTS AND PURCHASE ORDERS INCURED BEFORE THE JANUARY 24 EXPLOSION | | | | | | |
|---|---|---|---|---|---|---|
| Customer Name | Work Order Number | Part # | Description | Sales ($) | Work in Process ($) | Cure Amount ($) |
| PT. HUAYUEN | 101307 | 010-0001-024AF  C | BODY-ASY 2.00X2-300RF W1 Ti12 | .00 | 73,755.86 | 0.00 |
| PT. HUAYUEN | 101308 | 010-0007-024AF  B | BODY-ASY 2.00X2-600RF W1 Ti12 | .00 | 86,480.01 | 0.00 |
| MINERA PEÑAS | 003600-001 | W21803-001005  A | W2 17.00X18-300RF 316H CrC | 427,982.00 | .00 | 0.00 |
| MINERA PEÑAS | 003600-002 | W21803-001005  A | W2 17.00X18-300RF 316H CrC | 150,015.00 | .00 | 0.00 |

Procurement Contract No: MOR-203-009-0 of Severe Service Ball Valve for HUAYOU Indonesian Laterite-Nickel Ore Project between PT. Huayue Nickel Cobalt and Seller, dated April 25, 2019.

| OPEN CONTRACTS AND PURCHASE ORDERS INCURED AFTER THE JANUARY 24 EXPLOSION | | | | | | | |
|---|---|---|---|---|---|---|---|
| Customer | Customer PO | Part # | Description | Sales Order | Order Total ($) | Location | Cure Amount ($) |
| BARRICK GOLDSTRIKE MINES, INC. | 1236250 | WV33RFCGG01-00R | 3-300 WV ASY F255 CrO HDL | 0003785 | 6,000.01 | Curtiss-Wright | 0.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 1236251 | WV33RFCGG01-00R | 3-300 WV ASY F255 CrO HDL | 0003786 | 6,000.01 | Curtiss-Wright | 0.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 1236252 | WV33RFCGG01-00R | 3-300 WV ASY F255 CrO HDL | 0003787 | 6,000.01 | Curtiss-Wright | 0.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 1236141 | WV63RFCGG06-00R | 6-300 WV ASSY F255 CrO ACT | 0003788 | 10,000.01 | Curtiss-Wright | 0.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778942/R | WV63RFCGG06-00R | 6-300 WV ASSY F255 CrO ACT | 0003789 | 18,256.00 | 5008 Steffani | 0.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778943/R | WV63RFCGG06-00R | 6-300 WV ASSY F255 CrO ACT | 0003790 | 18,176.00 | 5008 Steffani | 0.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778939/R | WV53RFCGG01-01R  A | .5-300 WV ASY F255 CrO O2 HDL | 0003791 | 4,355.00 | 5008 Steffani | 0.00 |

18

4843-2667-2832.7

| | | | OPEN CONTRACTS AND PURCHASE ORDERS INCURED AFTER THE JANUARY 24 EXPLOSION | | | | |
|---|---|---|---|---|---|---|---|
| Customer | Customer PO | Part # | Description | Sales Order | Order Total ($) | Location | Cure Amount ($) |
| BARRICK GOLDSTRIKE MINES, INC. | 2778940/R | WV53RFCGG01-01R A | .5-300 WV ASY F255 CrO O2 HDL | 0003792 | 4,355.00 | 5008 Steffani | 0.00 |
| BARRICK GOLDSTRIKE MINES, INC. | | WV53RFCGG01-01R A | .5-300 WV ASY F255 CrO O2 HDL | 0003793 | 3,000.01 | 5008 Steffani | 0.00 |
| BARRICK GOLDSTRIKE MINES, INC. | | WV53RFCGG01-01R A | .5-300 WV ASY F255 CrO O2 HDL | 0003794 | 3,000.01 | 5008 Steffani | 0.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778938/R | SKF1182A-R A | 1-300 DC ASY CD4 CrO LEVER O2 | 0003795 | 3,246.00 | 5008 Steffani | 0.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778937/R | SKF1182A-R A | 1-300 DC ASY CD4 CrO LEVER O2 | 0003796 | 3,246.00 | Curtiss-Wright | 0.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778936/R | NV53RFCGG00-01R | .5-300 NV ASY F255 CrO BS O2 | 0003797 | 3,246.00 | M-Tech | 0.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778935/R | NV53RFCGG00-01R | .5-300 NV ASY F255 CrO BS O2 | 0003798 | 3,246.00 | 5008 Steffani | 0.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 1235919 | WV23RFCGG01-01R A | 2-300 WV ASY HDL F255 CrO O2 | 0003799 | 7,000.01 | 5008 Steffani | 0.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778926/R | WV23RFCGG01-01R A | 2-300 WV ASY HDL F255 CrO O2 | 0003800 | 5,962.00 | 5008 Steffani | 0.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778927/R | WV23RFCGG01-01R A | 2-300 WV ASY HDL F255 CrO O2 | 0003801 | 5,962.00 | 5008 Steffani | 0.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778933/R | WV23RFCGG01-01R A | 2-300 WV ASY HDL F255 CrO O2 | 0003802 | 5,823.00 | 5008 Steffani | 0.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778932/R | WV23RFCGG01-01R A | 2-300 WV ASY HDL F255 CrO O2 | 0003803 | 5,963.00 | 5008 Steffani | 0.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778931/R | WV23RFCGG01-01R A | 2-300 WV ASY HDL F255 CrO O2 | 0003804 | 6,563.00 | 5008 Steffani | 0.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778930/R | WV23RFCGG01-01R A | 2-300 WV ASY HDL F255 CrO O2 | 0003805 | 6,563.00 | 5008 Steffani | 0.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778934/R | WV23RFCGG01-01R A | 2-300 WV ASY HDL F255 CrO O2 | 0003806 | 5,963.00 | 5008 Steffani | 0.00 |

19

4843-2667-2832.7

| | | | OPEN CONTRACTS AND PURCHASE ORDERS INCURED AFTER THE JANUARY 24 EXPLOSION | | | | |
|---|---|---|---|---|---|---|---|
| Customer | Customer PO | Part # | Description | Sales Order | Order Total ($) | Location | Cure Amount ($) |
| BARRICK GOLDSTRIKE MINES, INC. | 1236149 | SKF1258A-R | 8-150 DC ASY 316 CrC | 0003811 | 13,000.01 | Curtiss-Wright | 0.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 1235933 | SKF1166A-R | 10-300 DC ASY Ti3 CrO ACT | 0003813 | 17,000.01 | 5008 Steffani | 0.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2779977/S | WG0331-0K09 | AGITATOR ASSY 8X8 Ti12 CrO | 0003828 | 161,500.00 | Blades at Tricor/Discs at Curtiss-Wright | 0.00 |
| WATSON VALVE SERVICES-AUSTR | 002226 | WV0503159OK | .5-300 B&S SET WV Ti12 CrO-H | 0003814 | 10,820.00 | | 0.00 |
| WATSON VALVE SERVICES-AUSTR | 002263 | WV0303159OG | 3-300 B&S SET WV 2507 CrO | 0003816 | 4,344.00 | | 0.00 |
| WATSON VALVE SERVICES-AUSTR | 002208 | MV0803159OG | B&S SET 8-300 MV 2507 CrO | 0003817 | 83,084.40 | | 0.00 |
| NEWMONT MINING CORP | 3002183558 | SKF1198A-R | .5-300 DC ASY TI CrO HDL O2 | | 7,730.90 | 5008 Steffani | 0.00 |
| NEWMONT MINING CORP | 3002183558 | WV53RUCGG01-01R | .5-300 WV ASY TI CrO HDL O2 | | 7,730.90 | 5008 Steffani | 0.00 |
| NEWMONT MINING CORP | 3002183558 | WV53RUCGG01-01R | .5-300 WV ASY TI CrO HDL O2 | | 7,730.90 | 5008 Steffani | 0.00 |
| NEWMONT MINING CORP | 3002183558 | WV53RUCGG01-01R | .5-300 WV ASY TI CrO HDL O2 | | 7,730.90 | 5008 Steffani | 0.00 |
| NEWMONT MINING CORP | 3002183558 | WV53RUCGG01-01R | .5-300 WV ASY TI CrO HDL O2 | | 7,730.90 | 5008 Steffani | 0.00 |
| NEWMONT MINING CORP | 3002183558 | WV53RUCGG01-01R | .5-300 WV ASY TI CrO HDL O2 | | 7,730.90 | 5008 Steffani | 0.00 |
| NEWMONT MINING CORP | 3002201716 | WV23RFCGG01-01R | 2-300 WV ASY F255 CrO HDL O2 | | 6,380.66 | 5008 Steffani | 0.00 |
| NEWMONT MINING CORP | 3002181626 | SK0406-0F09 | 8-300 WV ASY F255 CrO BS | | 17,263.00 | Curtiss-Wright | 0.00 |
| NEWMONT MINING CORP | 3002181626 | WV13RFCGG01-01R | 1-300 WV ASY F255 CrO HDL O1 | | 4,887.00 | Curtiss-Wright | 0.00 |

20

4843-2667-2832.7

## OPEN CONTRACTS AND PURCHASE ORDERS INCURED AFTER THE JANUARY 24 EXPLOSION

| Customer | Customer PO | Part # | Description | Sales Order | Order Total ($) | Location | Cure Amount ($) |
|---|---|---|---|---|---|---|---|
| NEWMMONT MINING CORP | 3002212368 | WV23RUCGG01-01R | 2-300 WV ASY F255 CrO HDL O2 | | 6,380.66 | Curtiss-Wright | 0.00 |
| NEWMMONT MINING CORP | 3002183618 | WV23RFCGG01-01R | 2-300 WV ASY F255 CrO HDL O2 | | 6,380.66 | Curtiss-Wright | 0.00 |
| NEWMMONT MINING CORP | Waiting on PO | WV13RFCGG01-01R | 1-300 WV ASY F255 CrO HDL O1 | | | Curtiss-Wright | 0.00 |
| NEWMMONT MINING CORP | 3002177172 | WV53RUCGG01-01R | 5-300 WV ASY F255 CrO HDL O5 | | 2,552.00 | Curtiss-Wright | 0.00 |
| NEWMMONT MINING CORP | 3002177172 | WV53RUCGG01-01R | 5-300 WV ASY F255 CrO HDL O5 | | 2,552.00 | Curtiss-Wright | 0.00 |
| NEWMMONT MINING CORP | 3002177172 | WV53RUCGG01-01R | 5-300 WV ASY F255 CrO HDL O5 | | 3,554.00 | Curtiss-Wright | 0.00 |
| NEWMMONT MINING CORP | 3002172887 | SKF1378A-R | 12-300 DC ASY TI CrO | | 36,012.00 | 5008 Steffani | 0.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778941/R | SKF1180A-R | 6-300 DC ASY CD4 CrO | | 20,389.00 | Curtiss-Wright | 0.00 |
| BARRICK GOLDSTRIKE MINES, INC. | 2778934/R | WV23RFCGG01-01R | 2-300 WV ASY F255 CrO HDL O2 | | 5,963.00 | 5008 Steffani | 0.00 |
| BARRICK - PUEBLO VIEJO (OBO) | Waiting on PO | SK0117-R | 1.5-1500 WV ASY 31803 CrO | | | 5008 Steffani | 0.00 |
| BARRICK - PUEBLO VIEJO (OBO) | Waiting on PO | SK0117-R | 1.5-1500 WV ASY 31803 CrO | | | 5008 Steffani | 0.00 |
| BARRICK - PUEBLO VIEJO (OBO) | Waiting on PO | SK0117-R | 1.5-1500 WV ASY 31803 CrO | | | 5008 Steffani | 0.00 |
| BARRICK - PUEBLO VIEJO (OBO) | Waiting on PO | SP00179-R | 8-600 OMB ASY 316 CrC O2 | | | 5008 Steffani | 0.00 |
| BARRICK - PUEBLO VIEJO (OBO) | Waiting on PO | SP00179-R | 8-600 OMB ASY 316 CrC O2 | | | 5008 Steffani | 0.00 |
| NEWMMONT MINING CORP | 3002177167 | WV23RFCGG01-01R | 2-300 WV ASY F255 CrO HDL O2 | | 5,632.00 | 5008 Steffani | 0.00 |

21

4843-2667-2832.7

| | OPEN CONTRACTS AND PURCHASE ORDERS INCURED AFTER THE JANUARY 24 EXPLOSION | | | | | | |
|---|---|---|---|---|---|---|---|
| Customer | Customer PO | Part # | Description | Sales Order | Order Total ($) | Location | Cure Amount ($) |
| NEWMONT MINING CORP | 3002215025 | SKF1378A-R | 12-300 DC ASY TI CrO | | 36,012.20 | 5008 Steffani | 0.00 |

| List of Quotes Given to Third Parties, but no Purchase Order Has Been Generated | | | | | |
|---|---|---|---|---|---|
| Customer Name | Description | Quantity | Sales | Estimated Cost | Cure Amount ($) |
| Watson Valve - Australia | 4" B/S Set | 6 | $33,732.00 | $20,239.20 | |
| Valvescom - East Grove | 4" Assembly | 1 | $10,306.23 | $6,183.74 | |
| Freeport McMoran | 3" Assembly | 1 | $10,874.13 | $6,524.48 | |
| Barrick Goldstrike | 6" Assembly | 1 | $17,403.00 | $10,441.80 | |
| Newmont | 10" @ 12" Valve | 1 Each | $63,244.00 | $37,946.40 | |
| Newmont | 2" Valve | 2 | $11,384.00 | $6,830.40 | |
| Newmont | 2" Valve | 1 | $6,380.00 | $3,828.00 | |
| Newmont | 2" Valve | 1 | $6,380.00 | $3,828.00 | |
| Newmont | 2" Valve | 1 | $6,380.00 | $3,828.00 | |
| Newmont | .5" Valve | 3 | $8,658.00 | $5,194.80 | |
| Newmont | .5" Valve | 6 | $35,000.00 | $21,000.00 | |
| Newmont | Blade Assembly | 1 | $35,000.00 | $21,000.00 | |

| | | | | Cure Amount ($) |
|---|---|---|---|---|
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |

22

4843-2667-2832.7

| Software Licenses | |
| --- | --- |
| License | Cure Amount ($) |
| Autodesk (AutoCad and Inventor)[1] | 0.00 |
| Global Shop Solutions[2] | 0.00 |
| SOLIDWORKS[3] | 0.00 |

[1] The Autodesk account is in the name of Watson Grinding. Buyer assumes the risk that the Autodesk license may be assigned.

[2] The Global Shop Solutions account is in the name of Watson Grinding. Buyer assumes the risk that the Global Shop Solutions license may be assigned.

[3] The SOLIDWORKS account is in the name of Seller. Buyer assumes the risk that the SOLIDWORKS license may be assigned.

23

4843-2667-2832.7

## Schedule 1.1(h)(iii)[4]

## Final Vendor Purchase Orders

| Final Vendor Purchase Orders to Vendors Holding Watson Valve's WIP | | |
|---|---|---|
| Vendor | Amount Owed (Cure Amount ($)) | Status |
| Curtiss-Wright | $36,343.00 | Current Open Invoices |
| Curtiss-Wright | $102,000.00 | Backlog yet to be Picked up until open invoices are paid |
| Tricor | $29,327.00 | Backlog Ready for Pickup - COD |
| ASAP | $10,020.00 | Current Open Invoices |
| M-Tech Machine | $2,000.00 | Backlog - COD |
| AIV | $6,387.00 | Current Open Invoices |
| AIV | $15,000.00 | Backlog yet to be Picked up until open invoices are paid |

| SPECIFIED FINAL VENDOR PURCHASE ORDERS WITH RESPECT TO THE HUAYOU INDONESIAN LATERITE-NICKEL ORE PROJECT BETWEEN PT. HUAYUE NICKEL COBALT AND SELLER, DATED APRIL 25, 2019 | | | |
|---|---|---|---|
| Vendor | Purchase Order Number | Date Order Placed | Amount Owed (Cure Amount ($)) |
| AMERICAN HELI-ARC | 5508 | 1/17/2020 | $ 10,240.00 |
| EGC | 5432 | 12/5/2019 | $ 2,403.00 |
| EGC | 5451 | 12/17/2019 | $ 4,228.09 |
| DIRECT BOLT | 5472 | 1/7/2020 | $ 3,470.67 |
| KPC METAL | 5405 | 11/15/2019 | $ 13,300.00 |
| KPC METAL | 5413 | 11/20/2019 | $ 5,968.00 |

| Outstanding Orders Between Watson Valve and Watson Grinding for the Huayou Project | | | | | |
|---|---|---|---|---|---|
| Customer Name | Work Order | Part # | Description | Material & Outside Service | Labor & Overhead |
| WATSON VALVE | 030333-003 | B10-0007-024AF   A | 2"-600 BODY | 60388.00 | 1196.14 |

---

[4] Note to Watson: Mogas has deleted the Purchase Orders on Schedule 1.2(k) based on discussions with counsel for the Trustee that these constitute Executory Contracts.

24

4843-2667-2832.7

| Customer Name | Outstanding Orders Between Watson Valve and Watson Grinding for the Huayou Project | | | | |
| --- | --- | --- | --- | --- | --- |
| | Work Order | Part # | Description | Material & Outside Service | Labor & Overhead |
| WATSON VALVE | 030393-001 | B10-0003-024AF   A | .75-600 BODY | 756.00 | 121.62 |
| WATSON VALVE | 030393-002 | 020-0003-024AF   A | 75-600 END PIECE | 960.00 | 64.54 |
| WATSON VALVE | 030393-003 | 060-0003-022AF   A | .75-900 STEM | 84.00 | .00 |
| WATSON VALVE | 030393-005 | 100-0003-02213   A | THRS, 0.63ID, 125CS Ti5 TiO-H | 22.00 | .00 |
| WATSON VALVE | 030393-006 | 120-0004-022   A | AE-RING 0.63ID, 125CS | 15.00 | .00 |
| WATSON VALVE | 030393-008 | 170-0002-024   A | .75-600/900BTM-PLT | 238.00 | 498.95 |
| WATSON VALVE | 030394-001 | B11-0009-024AF | 14" BODY | .00 | 162.00 |
| WATSON VALVE | 030394-002 | 021-0009-024AF | 14" END PIECE | .00 | 325.77 |
| WATSON VALVE | 030394-003 | 022-0009-024AF | 14" END PIECE | .00 | .00 |
| WATSON VALVE | 030394-005 | 060-0005-022AF   A | 14" STEM | 6596.00 | 3397.75 |
| WATSON VALVE | 030394-006 | 070-0005-014   A | 14"-300 GLAND FLANGE | 1560.00 | .00 |
| WATSON VALVE | 030394-009 | 100-0005-02213   A | 14" THRUST BEARING | 905.00 | 601.13 |
| WATSON VALVE | 030394-011 | 130-0006-028AG   A | 14" BUSH UP | 2968.00 | 19.52 |
| WATSON VALVE | 030395-001 | B10-0004-024AF   A | 10" BODY | .00 | 1347.42 |
| WATSON VALVE | 030395-002 | 020-0004-024AF   A | 10" END PIECE | .00 | 924.04 |
| WATSON VALVE | 030395-003 | 060-0004-022AF   A | 10" STEM | 24208.00 | 376.64 |
| WATSON VALVE | 030395-004 | 070-0004-014   A | GLAND FLG | 3728.00 | 1118.96 |
| WATSON VALVE | 030395-005 | 082-0004-022 | 10" LOCK-RING | .00 | .00 |
| WATSON VALVE | 030395-006 | 083-0005-024 | 10" LOCK-PLATE | .00 | .00 |
| WATSON VALVE | 030395-007 | 100-0004-02213   A | THRS 3.25ID | 1625.00 | 1188.17 |
| WATSON VALVE | 030395-009 | 130-0005-028AG   A | BUSH-UP | 4784.00 | .00 |
| WATSON VALVE | 030396-001 | B10-0008-024AF   A | 6" BODY | 17931.00 | .00 |
| WATSON VALVE | 030396-002 | 020-0008-024AF   A | 6" END PIECE | 29416.00 | 1885.92 |
| WATSON VALVE | 030396-003 | 060-0006-022AF   A | 6" STEM | 2928.00 | 642.81 |
| WATSON VALVE | 030396-004 | 070-0007-014   A | 6" GLAND GLANGE | 1416.00 | 297.93 |
| WATSON VALVE | 030396-005 | 100-0006-02213   A | THRS 2.500ID | 815.00 | .00 |
| WATSON VALVE | 030396-006 | 120-0007-022   A | 6" AE-RING | 710.00 | .00 |
| WATSON VALVE | 030396-007 | 130-0007-028AG   A | 6" BUSH-UP | 1520.00 | .00 |
| WATSON VALVE | 030397-001 | B10-0006-024AF   A | .75-900 BODY | 2260.00 | 141.64 |
| WATSON VALVE | 030397-002 | 020-0006-024AF   A | .75-900 END PIECE | 2120.00 | 56.36 |

4843-2667-2832.7

| | Outstanding Orders Between Watson Valve and Watson Grinding for the Huayou Project | | | | |
|---|---|---|---|---|---|
| Customer Name | Work Order | Part # | Description | Material & Outside Service | Labor & Overhead |
| WATSON VALVE | 030397-003 | 060-0003-022AF    A | .75-900 STEM | 168.00 | .00 |
| WATSON VALVE | 030397-004 | 070-0003-014    A | .75-600/900 GLAND FLANGE | 60.00 | 655.48 |
| WATSON VALVE | 030397-005 | 100-0003-02213    A | THRS, 0.63ID, 125CS Ti5 Ti0-H | 44.00 | .00 |
| WATSON VALVE | 030397-006 | 120-0004-022    A | AE-RING 0.63ID, 125CS | 22.00 | .00 |
| WATSON VALVE | 030397-007 | 130-0004-028AG    A | .75-600/900 UPPER BEARING | 95.00 | .00 |
| WATSON VALVE | 030397-008 | 170-0002-024    A | .75-600/900BTM-PLT | 414.00 | 97.87 |
| WATSON VALVE | 031085-001 | 010-0007-024AF | BODY-ASY 2.00X2-600RF | .00 | 6892.75 |
| WATSON VALVE | 033341-000 | 030-0001-02413AE A | B&S 2.00-300/600 W1 | .00 | .00 |
| WATSON VALVE | 033341-001 | 040-0001-02413AE A | 2" 300/600 BALL | 21690.00 | 27350.21 |
| WATSON VALVE | 033341-002 | 050-0001-02413AE A | 2" 300/600 SEAT | 3420.00 | 16860.64 |
| WATSON VALVE | 039309-000 | 030-0009-02413AE A | B&S .75-600 W1 | .00 | .00 |
| WATSON VALVE | 039309-001 | 040-0010-02413AE | .75-600 BALL | 370.00 | 969.12 |
| WATSON VALVE | 039309-002 | 050-0008-02413AE | .75-600 SEAT | 1178.00 | 609.15 |
| WATSON VALVE | 039404-000 | 030-0005-02413AE A | B&S 13.25-300 W2 | .00 | .00 |
| WATSON VALVE | 039404-001 | 040-0005-02413AE | 14" BALL | 39184.00 | 4294.17 |
| WATSON VALVE | 039404-002 | 050-0006-02413AE | 14" SEAT | 10408.00 | 93.35 |
| WATSON VALVE | 039510-000 | 030-0003-02413AE A | B&S 10.00-300 W2 | .00 | .00 |
| WATSON VALVE | 039510-001 | 040-0004-02413AE | 10" BALL | 109480.00 | 5354.01 |
| WATSON VALVE | 039510-002 | 050-0005-02413AE | 10" SEAT | 24242.00 | 4961.18 |
| WATSON VALVE | 039608-000 | 030-0007-02413AE A | B&S 6.00-600 W1 | .00 | .00 |
| WATSON VALVE | 039608-001 | 040-0006-02413AE A | 6" BALL | 10160.00 | 7042.03 |
| WATSON VALVE | 039608-002 | 050-0007-02413AE A | 6" SEAT | 7584.00 | 4329.35 |
| WATSON VALVE | 039709-000 | 030-0006-02413AE A | B&S .75-900 W1 | .00 | .00 |
| WATSON VALVE | 039709-001 | 040-0011-02413AE | .75-900 BALL | 380.00 | 877.71 |
| WATSON VALVE | 039709-002 | 050-0010-02413AE | .75-900 SEAT | 1178.00 | 1025.20 |
| WATSON VALVE | 046303-002 | 050-0001-02405AE | 2" SEAT | 90.00 | 95.84 |
| WATSON VALVE | 046309-000 | 300-0001-013 | BRKT WELD ASY | .00 | .00 |
| WATSON VALVE | 046309-001 | 320-0001 | TOP PLATE | .00 | .00 |

26

| | Outstanding Orders Between Watson Valve and Watson Grinding for the Huayou Project | | | | |
|---|---|---|---|---|---|
| Customer Name | Work Order | Part # | Description | Material & Outside Service | Labor & Overhead |
| WATSON VALVE | 046309-002 | 310-0001 | BRACKET LEG | .00 | .00 |
| | | Total China Project WIP in Watson Grinding | | 398,120.00 | 95,875.37 |

27

4843-2667-2832.7

## Schedule 1.2(k)

| SPECIFIED FINAL VENDOR PURCHASE ORDERS WITH RESPECT TO THE HUAYOU INDONESIAN LATERITE-NICKEL ORE PROJECT BETWEEN PT. HUAYUE NICKEL COBALT AND SELLER, DATED APRIL 25, 2019 | | | |
|---|---|---|---|
| Vendor | Purchase Order Number | Date Order Placed | Amount Owed (Cure Amount ($)) |
| SCORE VALVE | 5473 | 1/7/2020 | $ 184,330.00 |
| SUHM SPRINGS | 5492 | 1/13/2020 | $ 53,032.10 |
| SUHM SPRINGS | 5471 | 1/7/2020 | $ 94,668.00 |
| SUHM SPRINGS | 5450 | 12/16/2019 | $ 31,264.00 |
| East Grove - Acuators | 5099 | 6/19/2019 | $ 184,000.00 |

| Equipment Purchase Orders | | |
|---|---|---|
| Party | Equipment | Cure Amount ($) |
| Dunns Valve Tester | New Test Stand | 45,360.00 |

28

## Schedule 2.4(a)

## Pre-Closing Transactions / Indebtedness Outside Ordinary Course of Business

(None)